## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

DISINFORMATION INDEX, INC.,
1206 Orange Street
Wilmington, DE 19801

*Plaintiff*,

v.

FEDERAL TRADE COMMISSION; ANDREW
N. FERGUSON, in his official capacity as Chairman
of the Federal Trade Commission; MARK R.
MEADOR, in his official capacity as Commissioner
of the Federal Trade Commission; JOHN DOE 1, in
their official capacity as Commissioner of the
Federal Trade Commission; JOHN DOE 2, in their
official capacity as Commissioner of the Federal
Trade Commission; and JOHN DOE 3, in their
official capacity as Commissioner of the Federal
Trade Commission,
600 Pennsylvania Ave. NW Washington, DC 20580

*Defendants.*

Civil Case No. 1:25-cv-4137

**COMPLAINT**

**(Rule 57 Speedy Hearing Request)**

### INTRODUCTION

1.      In November 2024, Defendant Andrew Ferguson, now Chairman of the Federal Trade Commission ("FTC" or "Commission"), condemned Plaintiff Disinformation Index, Inc., also referred to as the Global Disinformation Index ("GDI"), a nonprofit that reports on online disinformation risks. Then-Commissioner Ferguson declared on X that "***the Global Disinformation Index . . . led collusive ad-boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States***."[1]

---

[1] Andrew Ferguson (@AFergusonFTC), X (Nov. 12, 2024, 8:15 PM), https://x.com/AFergusonFTC/status/1856152760850243905.

2.        Shortly after Ferugson was confirmed as Chairman of the Commission, he carried through on his threat and signed a Civil Investigative Demand ("CID"), directing GDI to produce 29 separate categories of documents and data (many with multiple sub-parts) going back to GDI's founding in 2018.

3.        The CID is part of the coordinated effort among Chairman Ferguson and a cadre of other former, current, or future Trump administration officials and House Republicans who claimed—and continue to claim—that GDI led a conspiracy to boycott conservative and independent media: Brendan Carr (Trump-appointed Chairman of the Federal Communications Commission), Elon Musk (Chairman and CTO of X Corp. and former Trump administration special Government employee), Ben Shapiro (Trump Campaign fundraiser and founder of The Daily Wire), Mike Benz (former Trump State Department Official), Matt Gaetz (former Congressman and Attorney General nominee), Marco Rubio (Trump-appointed Secretary of State), House Republicans Roger Williams, Jim Jordan and James Comer, have all attacked GDI through litigation, subpoenas, social media posts, articles, and podcast episodes.

4.        For example, Elon Musk, former special Government employee at the helm of the Trump-created Department of Government Efficiency ("DOGE")[2] and largest contributor to Trump's 2024 campaign, posted on X in the leadup to the 2024 election that "***GDI…should be shut down, with recriminations [sic] for the miscreants***."[3] Matt Gaetz, Trump's former Attorney General nominee and a long-time congressional ally of the President, reposted an X post calling GDI "***a conservative blacklist***."[4]

---

[2] *See generally New Mexico v. Musk*, 784 F. Supp. 3d 174 (D.D.C. 2025).
[3] Elon Musk (@elonmusk), X (Apr. 18, 2024, 6:58 PM),
https://x.com/elonmusk/status/1781094892866781255?s=46&t=2yQS3wsEbvI9bCYB3nT64Q.
[4] Matt Gaetz (@MattGaetz), X (Feb. 10, 2023, 4:05 PM),
https://x.com/mattgaetz/status/1624152499153141760.

5.      How, exactly, did GDI supposedly censor anyone? Chairman Ferguson and the others did not say.

6.      What, exactly, did GDI supposedly censor? Again, Chairman Ferguson and the others did not say.

7.      When, exactly, did GDI supposedly censor conservative voices? Chairman Ferguson and the others were silent.

8.      Nevertheless, Chairman Ferguson launched this investigation and issued an exceptionally broad CID to GDI and 16 other organizations. The Commission purports to be investigating an advertiser boycott, yet GDI is not an advertiser (it does not buy online advertisements) and it does not direct advertisers (or advertising agencies) on whether they should buy online advertisements, or how much online advertising to buy, or where to spend their money.

9.      GDI was founded as a strictly non-partisan nonprofit with a mission to educate the public, including advertisers, on the risks of disinformation in online news and the importance of information transparency. GDI pursued this mission by publishing research and risk rating reports on the likelihood that a given news website would misinform its readers with false or misleading content.

10.     GDI conducted independent risk assessments with neutral and transparent methodology to evaluate news sites based on criteria, such as adherence to journalistic standards, transparency of ownership and funding, editorial independence, and the use of fact-based reporting. GDI has assessed the content of websites (domains) in over 40 languages and evaluated websites visited by users from more than 100 countries via a proprietary algorithm. The results of these assessments were shared through research reports and digital resources.

11.     One of these resources was GDI's Dynamic Exclusion List ("DEL"), which

included a list of websites across the globe to inform advertisers, the ad tech industry, search and social media companies, and researchers around the world of the risks of advertisements being displayed adjacent to disinformation. Each of GDI's subscribers was free to use the DEL to inform its independent brand safety decisions or to disregard on a case-by-case basis, as it saw fit.

12.     Separate from the DEL, GDI's services also included media market reviews, publisher vetting, open-source intelligence analysis, and policy support. GDI offered these services to help each of its subscribers exercise its own judgment to identify reliable media sites and distinguish them from sites with a high risk of disseminating disinformation. GDI did not dictate or require certain advertising placements, it simply aimed to create transparency within the market about what was on the internet.

13.     Through these research reports and digital resources, GDI sought to enable fully informed transactions between buyer and seller, which is a key tenet of the free market.

14.     GDI thus was engaging in core First Amendment protected conduct. Just like any non-profit research organization, it gathered information, assessed its accuracy and brand-impact, and disseminated its findings.

15.     GDI reported an array of media sites as high-risk for containing false or misleading information. A number of those media sites—some with ties to the Trump administration—launched a retaliation campaign against GDI in an attempt to intimidate or harass the nonprofit.

16.     GDI has reported on websites that spread disinformation, including neo-Nazi propaganda. One, for example, is the website of the American Nazi Party.[5]

---

[5] *See, e.g.*, AMERICAN NAZI PARTY, www.americannaziparty.com (last visited Nov. 24, 2025).



## The White Worker

The Voice of Twenty-First Century American National Socialism for the
Working Class!



DOWNLOAD A FREE ISSUE!

Are you tired of being blamed
for all the world's problems –
simply because you are White?

GET THE FACTS

17.     GDI has reported on the disinformation risks of Russian propaganda websites, such as Russia Insider, which has published a post titled "Yet Another Six Million: The Fable of Pogroms against Jews in Tsarist Russia."[6] An ad for the popular shoe manufacturer, Crocs, was at one time published adjacent to this headline, meaning the website earned revenue from the Crocs brand—presumably without the knowledge of Crocs or their service providers.



18.     GDI's reporting also detected potentially brand-damaging declarations on left-leaning site Activist Post. For example, Activist Post has published that the "T.H.E.Y. (The Hierarchy Enslaving You) . . . want     our bodies to be internally fused and configured with their advancing 6G technology currently in development for controlling our every aspect, as part of inhuman agenda 2030 and beyond."[7]

---

[6] *See, e.g.*, *Yet Another Six Million: The Fable of Pogroms Against Jews in Tsarist Rusia*, RUSSIA INSIDER (Feb. 14, 2019), https://russia-insider.com/en/history/yet-another-six-million-fable-pogroms-against-jews-tsarist-russia/ri25143.
[7] *See, e.g.*, *6 Ways to Protect Yourself from Unprecedented 6G Health Threats*, ACTIVIST POST



ECONOMY    EMPIRE    ACTIVISM    HEALTH    TECH

August 19, 2025

# 6 Ways to Protect Yourself from Unprecedented 6G Health Threats

EDITOR / HEALTH / PAUL A. PHILIPS



T.H.E.Y (The Hierarchy Enslaving You) see us as nothing more than bio-hackable "animals," rather than mysterious human spirits. Regardless of any objection, T.H.E.Y want our bodies to be internally fused and configured with their advancing 6G technology currently in development for controlling our every aspect, as part of inhuman agenda 2030 and beyond.

The 6G technology, replacing 5G, involves plans to put smart gadget implants into human bodies while doing away with external devices such as smart phones. This plan has been disclosed by the likes of Nokia CEO Pekka Lundmark. Then there's the brain implant microchip visual interface also in development, with Elon musk overseeing.

(Aug. 19, 2025), https://www.activistpost.com/6-ways-to-protect-yourself-from-unprecedented-6g-health-threats/.

7

19.        GDI has reported on the risks of dissemination of disinformation from the Centre for Research on Globalization, which is a left-leaning site that publishes content such as "BREAKING: Peer Reviewed Report. 86% of PCR-Positive 'Covid Cases' Were Not Real Infections."[8]



20.     GDI has reported on the risks of disinformation from content posted on The Washington Standard, which publishes a wide variety of news including on how nasal flu vaccines are part of the government's depopulation scheme to free up electricity for artificial intelligence.[9] The article below, "Whistleblowers Claim There's A 'Plan' To Depopulate Humanity For A Larger AI Infrastructure" has featured an advertisement by T-Mobile (most likely unwittingly).

**Related Articles**



Trump Has Confirmed The CIA is Operating In Venezuela



60 Countries Banned The Pesticide Atrazine That Trump Insists Is Safe To Use In The US



Florida School Caught Promoting Witchcraft





US

### Whistleblowers Claim There's A "Plan" To Depopulate Humanity For A Larger AI Infrastructure

Date:  August 21, 2025



Recent whistleblower leaks suggest that there is a plan in place to depopulate humanity to create a larger artificial intelligence infrastructure. Depopulation will free up electricity and other resources needed to expand AI on the globe.





CHINA UNVEILS QUANTUM RADAR THAT COULD MAKE U.S. STEALTH JETS USELESS...

The 8 Most INSANE Liberal Moments From This Week! And My Thoughts...

Food Riots on the Horizon: Government Shutdown Poised to Ignite Chaos Over Lost Welfare Benefits...

[8] *BREAKING: Peer Reviewed Report. 86% of PCR-Positive "COVID Cases" Were Not Real Infections*, GLOB. RSCH. (Nov. 9, 2025), https://www.globalresearch.ca/breaking-86-pcr-positive-covid-cases-not-real-infections/5905098.
[9] *Whistleblowers Claim There's a "Plan" to Depopulate Humanity for a Larger AI Infrastructure*, WASH. STANDARD (Aug. 21, 2025), https://thewashingtonstandard.com/whistleblowers-claim-theres-a-plan-to-depopulate-humanity-for-a-larger-ai-infrastructure/.

21.     GDI created its reports to help its subscribers identify potentially brand-damaging content like this, so they could then decide whether they consider it brand-damaging and whether to continue purchasing advertising space on those sites.

22.     GDI's reporting is not "censoring" by any definition of the term. At no point has GDI ever taken any action to prevent the authors of this type of information from publishing their content. The Commission's CID, on the other hand, is effectively silencing GDI in retaliation for this reporting.

23.     Andrew Ferguson, now Chairman of the FTC, has used the antitrust laws as the latest example of harassment against GDI. Chairman Ferguson launched a specious investigation into GDI in direct retaliation to its First Amendment protected speech, media, and associational activities.

24.     Even before issuing the CID to GDI (and at least 16 other organizations as part of the same sweeping investigation), then-Commissioner Ferguson posted on X that "the Global Disinformation Index . . . led collusive ad-boycotts… to censor the speech of conservative and independent media."[10]

25.     A month after issuing the CID to GDI, Chairman Ferguson declared that "the supreme evil of antitrust" is "collusion with other firms and the creation of pre-made 'exclusion lists' to encourage advertisers to join *de facto* boycotts coordinated by advertising firms and other third parties."[11]

26.     The FTC does not have jurisdiction to bring enforcement actions against

---

[10] Andrew Ferguson (@FergusonFTC), X (Nov. 12, 2024, 8:15 PM), https://x.com/AFergusonFTC/status/1856152760850243905.

[11] Statement of Chairman Andrew N. Ferguson, *In the Matter of Omnicom Group / The Interpublic Group of Cos.*, Matter Number 2510049, Fed. Trade Comm'n (June 23, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/omnicom-ipg-ferguson-statement_0.pdf.

nonprofit organizations. 15 U.S.C. §§ 44–45; *Nat'l Federation of the Blind v. FTC*, 420 F.3d 331, 334 (4th Cir. 2005) (holding that nonprofits "fall outside the scope of the agency's jurisdiction"). The Commission's decision under Chairman Ferguson to issue a CID to GDI—a nonprofit clearly outside of the Commission's jurisdiction without sufficient notice of what information, if at all, might have relevance to such an investigation—is on its face nothing more than a direct invasion of GDI's First Amendment rights meant to punish GDI for its reporting activities, which Chairman Ferguson subjectively views as "censor[ing] the speech of conservative and independent media."[12] *See Moody v. NetChoice, LLC*, 603 U.S. 707, 741–42 (2024) ("On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana.")

27.    GDI's conduct in reporting on disinformation is protected under the First Amendment for the same reasons this Court found in granting an injunction requested in Media Matters for America ("Media Matters"): both are nonprofits "dedicated to monitoring [and] analyzing… misinformation in the U.S. media." *Media Matters for Am. v. FTC*, 1:25-cv-01959, ECF No. 1, ¶ 4 (D.D.C. June 23, 2025). GDI, like Media Matters, was targeted by Chairman Ferguson and others in the administration. The FTC's CID to GDI, like its CID to Media Matters, "present[s] a straightforward First Amendment violation." *See Media Matters for Am.*, 2025 WL 2378009 at *1–4 (D.D.C.) (granting Media Matters' request for preliminary injunctive relief from their CID as it "present[ed] a straightforward First Amendment violation").

28.    As this Court found in *Media Matters*, the Commission's investigation into GDI is "a sufficient retaliatory act as a matter of law" in violation of GDI's First and Fourth Amendment Rights. *See Media Matters for Am.*, 2025 WL 2378009 at *1–4 (D.D.C.). The Commission's

---

[12] Andrew Ferguson (@FergusonFTC), X (Nov. 12, 2024, 8:15 PM), https://x.com/AFergusonFTC/status/1856152760850243905.

extremely broad CID, directed at a nonprofit with little to no relevant information to the advertising industry boycott which the Commission purports to be investigating, is being wielded against GDI in retaliation for exercising its lawful free speech.

29.     Because of the Trump FTC and Chairman Ferguson's attempt to silence GDI with this CID, it has lost funding, which has forced it to pause much of its work.

30.     The underlying aim of the Commission seems to be to pursue an approach propounded by the Trump administration, which is to use the weight of the publicly funded executive machinery to harass a small organization until it dissolves completely, regardless of the merit of the accusations against it (of which, we submit, there is none).

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Plaintiff GDI's claims arise under the First and Fourth Amendments to the U.S. Constitution.

32.     This Court has authority to grant Plaintiff declaratory, injunctive, and other relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Court's inherent equitable powers.

33.     Subject matter jurisdiction exists under Article III because Plaintiff has suffered and will continue to suffer injuries-in-fact. There is a sufficient causal connection between Plaintiff's injuries and Defendants' pursuit of this investigation, and a favorable decision by this Court granting Plaintiff relief will redress those injuries. This dispute is ripe because Plaintiff's rights have already been violated, and Plaintiff will suffer further imminent invasions of those rights in the absence of relief from this Court. Plaintiff is justifiably concerned about the retaliatory intention and effect of the CID and the associated investigation, both of which have already chilled

Plaintiff's speech and caused it associational, financial, and other harms.

34.     Venue is proper under 28 U.S.C. § 1391(e)(1) because the Commission has its principal place of business and the individual Defendants perform their official duties in the District of Columbia. Venue is also proper because a substantial part of the events giving rise to Plaintiff's claims occurred in the District: The FTC issued its CID in the District; GDI's compliance or noncompliance therewith will occur in the District; and the substantial chill to and other acts of retaliation against Plaintiff have been—and continue to be—suffered, in substantial part, in the District.

**PARTIES**

35.     Plaintiff Disinformation Index, Inc. is a not-for-profit research center and brand safety reporter. It is registered as a 501(c)(3) corporation under the laws of the state of Delaware. It does not have a physical office location, and its work is global in scope.

36.     Defendant FTC is an administrative agency of the United States that is headquartered in Washington, D.C. Among other things, it is tasked with preventing unfair methods of competition, which include conduct that may also violate the antitrust laws. *See* 15 U.S.C. § 45(a)(2).

37.     Defendant Andrew N. Ferguson is the Chairman of the FTC. His business address is 600 Pennsylvania Avenue NW, Washington, D.C. 20580. Chairman Ferguson is responsible for overseeing the FTC's activities, including investigations such as the one complained of herein. Chairman Ferguson is the Commissioner that signed and authorized the CID issued to GDI. He is being sued in his official capacity.

38.     Defendant Mark R. Meador is the second Commissioner of the FTC. His business address is in Washington, D.C. Commissioner Meador is responsible for overseeing the

FTC's activities, including investigations such as the one complained of herein. He is being sued in his official capacity.

39.     Defendant John Doe 1 is the third Commissioner of the FTC and is the individual serving out the unexpired term of former FTC Commissioner Melissa Ann Holyoak. On information and belief, their business address is in Washington, D.C., and they are also responsible for overseeing the FTC's activities, including investigations such as the one complained of herein. They are being sued in their official capacity.

40.     Defendant John Doe 2 is Rebecca Kelly Slaughter or the individual serving out the unexpired term of the fourth Commissioner of the FTC. On information and belief, their business address is in Washington, D.C., and they are also responsible for overseeing the FTC's activities, including investigations such as the one complained of herein. They are being sued in their official capacity.

41.     Defendant John Doe 3 is the fifth Commissioner of the FTC and is the individual serving out the unexpired term of former FTC Commissioner Alvaro Bedoya. On information and belief, their business address is in Washington, D.C., and they are also responsible for overseeing the FTC's activities, including investigations such as the one complained of herein. They are being sued in their official capacity.

## FACTUAL ALLEGATIONS

### A. GDI, a nonprofit organization, reported on the risks of disinformation on the internet.

42.     Since its founding in 2018, GDI has been a strictly non-partisan entity. It was organized and maintains its status as a 501(c)(3) nonprofit dedicated exclusively to charitable and educational purposes, with a mission to educate the public, including advertisers, on the risks of disinformation in online news and the importance of information transparency. GDI pursued this

mission by publishing research and risk rating reports on the likelihood that a given news website would misinform readers with false or misleading content.

43.     GDI's work has been global in scope and the vast majority of its work has focused on assessing disinformation outside of the United States, as discussed below.

44.     After starting off with five employees in 2018, GDI grew to 36 employees globally in 2023 with employees in various countries across five continents, including the United Kingdom, Italy, India, Kenya, Australia, Canada, and the United States. Since November 2024, GDI's staff has reduced from 22 to four employees—with work in the U.S. ceasing entirely.

45.     The Trump FTC's harassment campaign in response to GDI's reporting has forced GDI to significantly reduce the number of its employees. Currently, GDI is down to just four employees.

46.     Like the internet, the scope of GDI's work was global. As of October 2025, GDI has assessed the content of websites (domains) published in over 40 languages and evaluated websites visited by users from more than 100 countries via a proprietary algorithm.

47.     GDI's global focus is also reflected in the reports that GDI has published on the online news markets in numerous countries around the world, such as Senegal, Thailand, and Germany.

48.     GDI's reporting activities, as relevant here, include the publishing of its DEL and its research reports.

49.     First, GDI offered a neutral, independent, transparent index of a website's risk of disinforming readers—the DEL—to inform advertisers, the ad tech industry, search and social media companies, and researchers around the world of the possibility that they, or their advertisements, might be sited on the same pages as, and potentially adjacent to the most extreme

disinformation, hate speech, and other potentially brand damaging messages. GDI's DEL was a global product that covered 20 languages and 40 global media markets. Only half of GDI's DEL included website domains in or targeting audiences in the United States.

50.    Second, GDI published bespoke research reports to policy makers in governments, regulatory bodies, platforms around the world, and to the general public, per its mission. Of GDI's approximately 40 media market reviews, it published only one single media market review in the United States in December 2022, *Disinformation Risk Assessment: The Online News Market in the United States*. *See* Ex. A.

**B.    The Daily Wire, the Federalist, and the State of Texas harassed GDI for its media market review about disinformation in the United States, and Marco Rubio piled on their accusations of "censorship."**

51.    GDI's non-profit activities have been funded by generous donors, the majority of which are non-governmental organizations.

52.    As part of its work outside of the United States, GDI received funding from the Global Engagement Center ("GEC"), an interagency center which at the time was funded by the U.S. Department of State ("State Department") with a mission "to direct, lead, synchronize, integrate, and coordinate efforts of the Federal Government to recognize, understand, expose, and counter foreign state and foreign non-state propaganda and disinformation efforts aimed at undermining or influencing the policies, security, or stability of the United States and United States allies and partner nations."[13]

53.    "GDI first received a $100,000 award in 2021 as a finalist in the U.S.-Paris Tech Challenge, a collaboration which included both the GEC and NATO that 'sought to fund organizations based in European Economic Area and the United Kingdom to advance the

---

[13] *About Us – Global Engagement Center*, DEP'T OF STATE, https://2021-2025.state.gov/about-us-global-engagement-center-2/ (last visited Nov. 24, 2025).

development of technologies that combat disinformation and propaganda globally.'" *Daily Wire, LLC v. Dep't of State*, No. 1:24-mc-00963-DAE, ECF No. 11, at 5 (W.D. Tex. Nov. 6, 2024). "GDI used the funding to add language capabilities in Chinese, Japanese, Korean, Vietnamese, Russian, and Ukrainian" to its proprietary algorithm. *Id.*

54.     "GDI also received a grant from the National Endowment for Democracy," for work outside the United States and in non-European languages." *Id.* "National Endowment for Democracy is a private, nonprofit organization formally recognized under the National Endowment for Democracy Act of 1983 (NED Act), 22 U.S.C. §§ 4411 et seq." *See Nat'l Endowment for Democracy v. United States*, 25-cv-00648-DLF (D.D.C. Aug. 11, 2025) (granting preliminary injunction).

55.     The National Endowment for Democracy ("NED") receives Congressionally appropriated funds from the State Department. *See id* at 2. "When providing grants, the State Department 'may not require the Endowment to comply with requirements other than those specified in' [22 U.S.C. § 4412]." *Id.*

56.     Because of the U.S. Paris Tech Challenge award and NED funding, GDI has been accused of "aid[ing] the Biden administration's efforts to blacklist and block conservative media companies" by "feed[ing] blacklists to ad companies with the intent of defunding and shutting down websites peddling alleged 'disinformation.'"[14]

57.     Chairman Ferguson's own post on X shows that he has embraced this unfounded conspiracy theory pushed by conservatives online that two government grants GDI

---

[14] *CRA Budget in Focus: Department of State and Foreign Aid*, CTR. FOR RENEWING AM. (Apr. 11, 2023), https://americarenewing.com/issues/cra-budget-in-focus-department-of-state-and-foreign-aid/ (internal citations omitted); *see also State Department-Backed Group to Stop Funding 'Disinformation' Index that Targeted Right-Leaning Sites*, FOX NEWS (Feb. 21, 2023), https://www.foxnews.com/media/state-department-backed-group-stop-funding-disinformation-index-targeted-right-leaning-sites.

received from the State Department for researching disinformation abroad somehow "led to collusive boycotts."[15]

58.     Using this pretext, Chairman Ferguson has pursued this investigation as a means to punish GDI for its research and reporting—activity that is protected by the First Amendment.

59.     In December 2022, GDI published its one and only report on the United States digital media market. *See* Ex. A . In that report, GDI published the results of a disinformation risk assessment of United States media sites. *Id.* at 4.

60.     The publicly published report assessed the likelihood, among the sample of 69 U.S. news websites, that a given media site may disinform its readers based on over a dozen factors including headline accuracy, sensational language, and comment policies. *Id.* at 7. The report used its assessment findings to rank the ten news sources (of the 69 studied) with the lowest level of disinformation risk and the ten news sources (of the 69 studied) with the highest level of disinformation risk. *Id.* at 19–21.

61.     GDI's December 2022 media market review was not funded by nor had anything to do with the funding that it received from the U.S.-Paris Tech Challenge and NED. The report was funded by two private foundations.

62.     GDI's media market review identified several media sites, including The Daily Wire and The Federalist, as being among the top ten highest     disinformation risk sources out of the 69 websites sampled as part of that particular study. *Id*. at 20–21.

---

[15] Andrew Ferguson (@AFergusonFTC), X (Nov. 12, 2024, 8:15 PM), https://x.com/AFergusonFTC/status/1856152760850243905; *see also Small Business: Instruments and Casualties of the Censorship-Industrial Complex*, U.S. HOUSE COMM. ON SMALL BUS., Interim Staff Report 2024 at 29, https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_cic_report_september_2024.pdf.

63.     The Daily Wire is a conservative media outlet founded by Ben Shapiro.

64.     Ben Shapiro supported Trump in the 2024 election and co-hosted at least one fundraiser for Trump in 2024. Shapiro, on March 15, 2024 during an episode of his podcast The Ben Shapiro Show, which is produced by The Daily Wire, titled "Why I'm Giving Money to Donald Trump," explained that "I'm not just voting for Donald Trump, next week I will be co-hosting a fundraiser for him."[16]

65.     The Federalist is an online magazine and division of FDRLST Media LLC, which recently published an article by Secretary of State Marco Rubio.[17]

66.     These media sites took issue with GDI's media market review findings and responded with a coordinated harassment campaign aimed at GDI and other disinformation researchers.

67.     In December 2023, The Daily Wire LLC, FDRLST Media LLC (d/b/a The Federalist), and the State of Texas sued the State Department proclaiming that its GEC "funded, promoted, and/or marketed two American censorship enterprises: the Disinformation Index Inc., operating under the name Global Disinformation Index ('GDI'), and NewsGuard Technologies, Inc. ('NewsGuard')." *Daily Wire, LLC v. Dep't of State*, No. 6:23-cv-609-JDK ECF No. 1 at ¶ 3 (E.D. Tex. Dec. 6, 2023).

68.     GDI's operations were discussed throughout the plaintiffs' complaint. *See id.* at ¶¶ 3–4, 59, 87, 101, 102, 105-117, 123, 125–41, 154, 157, 161, 174, 176, 217. Several statements in the complaint and preliminary injunction motion related to GDI were not correct. *Daily Wire,*

---

[16] *The Ben Shapiro Show, Why I'm Giving Money to Donald Trump*, THE DAILY WIRE (March 15, 2024) https://www.youtube.com/watch?v=xgcwgy5CaBg.

[17] Marco Rubio, *Rubio: To Protect Free Speech, The Censorship-Industrial Complex Must Be Dismantled*, THE FEDERALIST (Apr. 16, 2025), https://thefederalist.com/2025/04/16/rubio-to-protect-free-speech-the-censorship-industrial-complex-must-be-dismantled/.

*LLC v. Dep't of State*, No. 1:24-mc-00963-DAE, ECF No. 11, at 5 (W.D. Tex. Nov. 6, 2024).

69.     Despite GDI's non-party status, the *Daily Wire* plaintiffs served GDI with a subpoena in July 2024, which contained five "all documents" requests.

70.     GDI co-operated and produced over 250 documents related to GDI's receipt of federal funding to the plaintiffs in good faith. *Id.* at 2.

71.     The *Daily Wire* plaintiffs nevertheless filed a motion to compel discovery, which the District Court for the Western District of Texas denied in November 2024, finding that the subpoena was "facially overbroad and disproportionate to the needs of the case." *Id.* at 6. For example, Request No. 5 called for GDI to "'[p]roduce all Communications, Documents, and Information from 2019 to the present that that [sic] refer to, or relate to, any product, service, tool, or technology, You create or offer…that relates to' 23 related terms" *Daily Wire, LLC v. Dep't of State*, No. 1:24-mc-00963-DAE, ECF No. 11 at 4, 6 (W.D. Tex. Nov. 6, 2024) (order denying motion to compel discovery responsive to Requests No. 1 and 5).

72.     On April 16, 2025, weeks before the Commission issued its CID to GDI, Trump administration official, Secretary of State Marco Rubio joined The Federalist's retribution campaign by publishing a piece on its site discussing the allegations underlying the *Daily Wire* case and calling out GDI by name.[18]

73.     The piece focused on Rubio's intention as Secretary of State to abolish the GEC, which Rubio asserted was "a dark chapter in America's constitutional history: the weaponization of America's own government to silence, censor, and suppress the free speech of ordinary Americans."[19] Rubio wrote, "My choice to publish this piece in The Federalist is no coincidence. One recipient of your taxpayer dollars was a British entity called the Global

---

[18] *Id.*
[19] *Id.*

Disinformation Index (GDI). GDI once produced a list of the top 10 'riskiest online news outlets' in a direct bid to drive off their ad revenue and put them out of business. Every one of those 10 sites was on the political right, and The Federalist was among them."[20]

74.     As discussed above, and as attested by Dr. Rogers in the *Daily Wire* litigation, the State Department GEC funding that GDI received did not fund and was unrelated to GDI's December 2022 media market review that ranked the relative risk levels of media sites in the United States.

### C. Trump administration officials also retaliated against GDI for its reporting through the DEL.

75.     While the *Daily Wire* litigation and Marco Rubio's article targeted GDI's media market review, GDI has also received backlash from Trump administration officials for its reporting through the DEL.

76.     The DEL is a report that GDI provided to its subscribers to assess risk on the internet on a global scale and to make their own independent decisions.

77.     In early 2023, the Washington Examiner published a widely circulated investigative series that accused GDI of participating in a "stealth operation blacklisting and trying to defund conservative media."[21] The series alleged that GDI's DEL was used by ad tech companies to block revenue to right-leaning outlets, smearing GDI's work as a partisan effort to suppress dissenting viewpoints.[22]

78.     The Washington Examiner's investigative series spurred a FOIA request and

---

[20] *Id.*

[21] Gabe Kaminsky, *Disinformation Inc: Meet the Groups Hauling in Cash to Secretly Blacklist Conservative News*, Wash. Exam'r (Feb. 15, 2023),
https://www.washingtonexaminer.com/news/2749593/disinformation-inc-meet-the-groups-hauling-in-cash-to-secretly-blacklist-conservative-news/.

[22] *Id.*

lawsuit by Protect the Public's Trust, which is led by Michael Chamberlain, a former Trump administration official.[23]

79.      The series was also heavily cited by Congressman James Comer (R-KY), Chairman of the House Committee on Oversight and Accountability, in his letter to former Secretary of State Anthony Blinken, which requested documents from the State Department to "investigat[e] reports that federal funds administered by the Department of State (Department) were used to suppress lawful speech and defund disfavored news outlets under the guise of combatting disinformation."[24] Chairman Roger Williams' (R-TX) House Committee Interim Report also cited the Washington Examiner's inquiry into and criticism of GDI's practices.[25]

80.      Former Republican Congressman Matt Gaetz (R-FL), who reportedly withdrew himself from consideration as Trump's Attorney General over "allegations of human trafficking, illegal drug use, and paying for sex, including with a 17-year old,"[26] reposted part of the Washington Examiner series on X, which called GDI a "conservative blacklist," and commented "Very important!"[27]

---

[23] Letter from Protect the Public's Trust to Off. of Info. Programs and Servs. (Feb. 22, 2023), https://protectpublicstrust.org/wp-content/uploads/2023/02/FOIA-PPT-State-GDI-3.pdf.
[24] Letter from James Comer, Chairman, Comm. on Oversight and Accountability, to Antony Blinken, Secretary, U.S. Dep't of State (Feb. 23, 2023), https://oversight.house.gov/wp-content/uploads/2023/02/Letter-to-State-Department-on-GDI-funding.pdf
[25] *Small Business: Instruments and Casualties of the Censorship-Industrial Complex*, U.S. HOUSE COMM. ON SMALL BUS., Interim Staff Report 2024 at 37, https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_cic_report_september_2024.pdf.
[26] Mike Wendling, *Trump's Withdrawn Attorney General Pick will not Return to Congress*, BBC NEWS (Nov. 22, 2024), https://www.bbc.com/news/articles/cj0jgle8qnyo.
[27] Matt Gaetz (@MattGaetz), X (Feb. 10, 2023, 4:05 PM), https://x.com/mattgaetz/status/1624152499153141760.



81.     Congressmen Matt Gaetz (R-FL) and Jim Jordan (R-OH), according to the Washington Examiner's later reporting "vow[ed] to investigate the State Department for bankrolling a 'disinformation' tracking group that is, as the Washington Examiner revealed, secretly blacklisting and taking steps to defund conservative media outlets."[28]

82.     Congressman Jordan thereafter chaired the "Select Subcommittee on Weaponization of the Federal Government," which held a series of hearings about topics including "the government's role in funding the development of AI-powered censorship and propaganda tools that can be used by governments and Big Tech to monitor and censor speech at scale."[29]

83.     In April 2024, UnHerd, posted a video on "how [GDI] censors political speech across Europe and the US."[30] UnHerd had been included on GDI's DEL as a website that poses

---

[28] Gabe Kaminsky, *Disinformation Inc: Jim Jordan and Matt Gaetz Vow Investigation into Conservative Site Blacklists*, WASH. EXAM'R (Feb. 16, 2023), https://www.washingtonexaminer.com/news/1853747/disinformation-inc-jim-jordan-and-matt-gaetz-vow-investigation-into-conservative-site-blacklists/.

[29] *Hearing on the Weaponization of the Federal Government*, SELECT SUBCOMMITTEE ON THE WEAPONIZATION OF THE FED. GOV'T (Feb. 6, 2024) https://judiciary.house.gov/committee-activity/hearings/hearing-weaponization-federal-government-5.

[30] Freddie Sayers (@freddiesayers), X (Apr. 17, 2024, 9:24 AM), https://x.com/freddiesayers/status/1780588224261317108?s=46&t=2yQS3wsEbvI9bCYB3nT64 Q.

significant risk of disseminating brand-damaging content with at least one of its authors posting "anti-LGBTQI+ narratives."—for example, one post is titled "The fictional world of trans activism..."[31] Other posts include attention-grabbing headlines such as "Cousin marriage isn't unspeakable…"[32] and "Can paedophilia ever be a thought experiment?..."[33]

84.    Reposting UnHerd's April 2024 video, Elon Musk,[34] who later became the single-most significant donor to the Trump 2024 Presidential campaign and who served the Trump administration as a special Government employee at the beginning of Trump's second term, added that "Ironically, GDI pushes disinformation and should be shut down, with recriminations [sic] for the miscreants."[35]

---

[31] *The Fictional World of Trans Activism There's Nothing Harmless about Denying the Truth*, UNHERD (Mar. 22, 2022), https://unherd.com/2022/03/the-fictional-world-of-trans-activism/.

[32] *Cousin Marriage Isn't 'Unspeakable' but What Is It We're Actually Saying?*, UNHERD (Dec. 20, 2024), https://unherd.com/2024/12/cousin-marriage-isnt-unspeakable/.

[33] *Can Paedophilia Ever Be a Thought Experiment? Philosophy Professors Are No Longer Safe*, UNHERD (Sept. 22, 2023), https://unherd.com/2023/09/can-paedophilia-ever-be-a-thought-experiment/.

[34] As set out in significant detail in the Media Matters case, Elon Musk himself "promise[d] to file 'a thermonuclear lawsuit against Media Matters'" for its reporting that "corporate advertisements on X appeared adjacent to antisemitic posts, and that Musk had endorsed an antisemitic conspiracy theory." *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966 at *1 (D.C. Cir. Oct. 23, 2025) (quoting *Media Matters for Am. v. Paxton*, 138 F.4th 563, 569 (D.C. Cir. 2025). X Corp. filed a lawsuit in federal district court against Media Matters, and the Texas and Missouri Attorneys General issued sweeping civil investigative demands to Media Matters, which have since been enjoined as retaliatory under the First Amendment. *Id*.

[35] Elon Musk (@elonmusk), X (Apr. 18, 2024, 6:58 PM), https://x.com/elonmusk/status/1781094892866781255?s=46&t=2yQS3wsEbvI9bCYB3nT64Q.



85.    The House Committee on Small Business led by Chairman Roger Williams (R-TX) published an Interim Staff Report dedicating a section to discussing GDI's reporting activities, and cites the Washington Examiner, the Federalist, and UnHerd—sites that GDI had identified as presenting a high-risk of disseminating disinformation. The report characterizes GDI's DEL as "essentially a blacklist."[36]

---

[36] *Small Business: Instruments and Casualties of the Censorship-Industrial Complex*, U.S. HOUSE COMM. ON SMALL BUS., Interim Staff Report 2024 at 29,

86.     During the hearings held in June 2024 that led to the Interim Staff Report, Dr. Mary Anne Franks, a George Washington University Law Professor testified that "the call is coming from inside the House" and that "[t]he harassment and silencing of misinformation researchers … threatens free speech and democracy on an unprecedented scale."[37]

87.     Her testimony further stated that "Counter speech is not censorship. Criticism is not censorship. Research, even when government-funded, is not censorship. Providing information to advertisers or businesses about what content their ads appear next to is not censorship. Efforts to convince consumers, business, and the public that certain kinds of content are false, fraudulent, harmful, extremist, harassing, or exploitative—regardless of whether that content is protected by the First Amendment—is not censorship."[38]

88.     Dr. Franks further testified that the federal government has been harassing disinformation researchers through "record requests, subpoenas and lawsuits."[39] "For engaging in this speech, they are being vilified, defunded, harassed, and threatened, including by members of Congress."[40]

89.     The House Interim Staff Report, however, appeared to give no regard to this testimony from Dr. Franks.[41]

---

https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_cic_report_september_2024.pdf.

[37] *Under the Microscope: Examining the Censorship-Industrial Complex and its Impact on American Small Businesses*, U.S. HOUSE OF REPRESENTATIVES SMALL BUSINESS COMM. HEARING, Written Testimony of Dr. Mary Anne Franks at 4 (June 24, 2024), https://democrats-smallbusiness.house.gov/uploadedfiles/06-26-24_dr._franks_testimony.pdf.

[38] *Id.* at 3.

[39] *Id.* at 4.

[40] *Id.* at 3.

[41] *Small Business: Instruments and Casualties of the Censorship-Industrial Complex*, U.S. HOUSE COMM. ON SMALL BUS., Interim Staff Report 2024, https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_cic_report_september_2024.pdf.

90.     The federal government's harassment of GDI continued to gain momentum just as then-Commissioner Ferguson started making his bid for Chairman of the FTC. In his run for FTC Chair, Ferguson flaunted that he had "a track record of standing up to . . . the radical left" and would "investigate . . . advertiser boycotts."[42] *Media Matters for Am.*, 2025 WL 2378009 at *19 (D.D.C.).

91.     While serving as Commissioner and prior to launching this retaliatory investigation, Ferugson latched on to the allegations asserted in the *Daily Wire* litigation and publicly leveled accusations that specifically targeted GDI.

92.     In late November 2024, then-Commissioner Ferguson was interviewed by Mike Benz, former Trump administration State Department Official and Director of the Foundation for Freedom Online, to discuss "how the FTC can combat censorship and promote innovation."[43]

93.     NBC News has reported that Benz published content under the pseudonym "Frame Game" and made statements like "[if] you were to remove the Jewish influence on the West . . . white people would not face the threat of white genocide that they currently do" and "[t]he fight for white identity would mean a battle for the soul of the internet itself."[44]

94.     Leading up to interviewing Ferguson, Mike Benz made numerous public statements about GDI. As early as March 2, 2023, Mike Benz began posting on X claiming that

---

[42] *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, PUNCHBOWL NEWS, https://punchbowl.news/wp-content/uploads/FTC-Commissioner-Andrew-N-Ferguson-Overview.pdf.

[43] Andrew Ferguson (@AFergusonFTC), X (Nov. 27, 2024, 9:33 AM), https://x.com/afergusonftc/status/1861780403092099278?s=46&t=2yQS3wsEbvI9bCYB3nT64Q.

[44] *Michael Benz, A Conservative Crusader Against Online Censorship, Appears to Have a Secret History as an Alt-Right Persona*, NBC NEWS (Oct. 6, 2023), https://www.nbcnews.com/tech/internet/michael-benz-rising-voice-conservative-criticism-online-censorship-rcna119213.

GDI is "part of a class of censorship mercenary firms,"[45] is part of the "censorship industry,"[46] and implied that GDI is part of a CIA plot.[47]

95.    On November 12, 2024, on his official account @AFergusonFTC, then-Commissioner Ferugson quoted Benz in an X post, which included a screenshot of a Wall Street Journal article discussing how the GEC may be shut down under the Trump administration. The text of Ferguson's post parroted the theory from the *Daily Wire* litigation and the House Interim Staff Report, that by using GEC funds "the Global Disinformation Index and NewsGuard . . . led collusive ad boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States."[48]

---

[45] Mike Benz (@MikeBenzCyber), X (Apr. 18, 2024, 10:36 AM), https://x.com/MikeBenzCyber/status/1780958657729253674.

[46] Mike Benz (@MikeBenzCyber) , X, (Aug. 21, 2023, 11:36 AM), https://x.com/MikeBenzCyber/status/1693663142746996756.

[47] *See* Mike Benz (@MikeBenzCyber), X (Aug. 21, 2023, 9:56 AM), https://x.com/MikeBenzCyber/status/1693662849401598381 (stating that "GDI is part of a vast new class of 'middleware' orgs staffed by spooks & CIA creeps to Kill Your Media Company"); *see also* Mike Benz (@MikeBenzCyber), X (Mar. 2, 2023, 12:35 PM), https://x.com/MikeBenzCyber/status/1631347477465948174 (stating "GDI is just one of a tiny handful of dozens (hundreds, actually, if you include State Dept, CIA and USAID) of similarly situated government-backed censorship orgs").

[48] Andrew Ferguson (@AFergusonFTC), X (Nov. 12, 2024, 8:15 PM), https://x.com/AFergusonFTC/status/1856152760850243905.



**Andrew Ferguson** ✓
@AFergusonFTC

Big win for free speech. One of the major organs of the censorship industrial complex goes down.

No government agency should be in the business of policing speech. Nebulous terms like "misinformation," "disinformation," and "malinformation," really mean any speech which goes against the elite consensus in DC and Silicon Valley.

In 2022, the FTC issued a report that praised the Global Engagement Center for "defend[ing] against foreign disinformation and propaganda," and suggested the GEC was best "positioned to advise Congress" on how to counter disinformation. But Congressional investigations revealed the GEC funded the Global Disinformation Index and NewsGuard, which led collusive ad-boycotts— possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States.

🌐 **Mike Benz** ✓ @MikeBenzCyber · 11 Nov 24
Oh no anything but that

≡          **WSJ**

[ **SUBSCRIBE** ]    [ SIGN IN ]

~~Censors Domestic Citizens~~
NATIONAL SECURITY

# State Department Division That ~~Battles~~ ~~Foreign Disinformation~~ Faces Closure

The Global Engagement Center, which has been criticized by Elon Musk, may be shut down as Trump prepares to take power

By *Michael R. Gordon* [ Follow ] *and Dustin Volz*
[ Follow ]
*Nov. 10, 2024 at 10:00 am ET*

8:51 PM · 11 Nov 24 · **572K** Views

29

96.     During the interview with Benz, Ferugson discussed the prospect of a Republican-led FTC acting against organizations he believes contribute to what he calls the "censorship industrial complex." [49] Just like in his X post, during the interview he called out NewsGuard by name and addressed the "constellation of NGOs" that he believes to be "suppress[ing] disinformation."[50] He further proclaimed that "antitrust laws may have something to do with what's been going on [with] . . . advertiser boycotts."[51] Benz posted this video on X and stated "I spoke today with @AFergusonFTC, who laid out a compelling vision for how the FTC can take on advertiser boycott collusion and Big Tech collusion in the Internet censorship space to protect consumers, promote market competition, and save free speech online."[52] Then-Commissioner Ferguson reposted Benz's X post and video on his official account and stated "@MikeBenzCyber is a tireless defender of free speech. I talked with him about how the FTC can combat censorship and promote innovation."[53]

---

[49] Mike Benz (@MikeBenzCyber), X (Nov. 24, 2024, 6:59 PM), https://x.com/mikebenzcyber/status/1860835679560765841?s=46&t=2yQS3wsEbvI9bCYB3nT64Q.
[50] Id.
[51] Id.
[52] Id.
[53] Andrew Ferugson (@AFergusonFTC), X (Nov. 27, 2024, 9:33 AM), https://x.com/AFergusonFTC/status/1861780403092099278.



97.     Later in November 2024 during an interview on Steve Bannon's WarRoom podcast, Ferguson reiterated his belief in the importance of going after "purely private censorship" and the "censorship industrial complex," and stated that because "progressives, Silicon Valley, everyone who is fighting 'disinformation' is not just going to give up because of the election … And that's why I think it is really important that the FTC take investigative steps in the new administration under President Trump."[54]

---

[54] *Bannon's WarRoom, Show Clip Roundup 11/30/2024 [AM]*, WARROOM (Nov. 30, 2024), https://warroom.org/bannons-warroom-show-clip-roundup-11-30-2024-am/.



98.     Also in November 2024, Brendan Carr, who had just been announced as President-elect Trump's pick to Chair the Federal Communications Commission, began posting on X about dismantling the "censorship cartel."[55] In a series of posts, Carr declared that the "censorship cartel must be dismantled and destroyed. Now."[56]

99.     On December 2, 2024, in a concurring statement in the *FTC v. GOAT* matter, then-Commissioner Ferguson opined that "[t]here is another danger to free speech on the Big Tech platforms that may fall within our antitrust bailiwick: advertiser boycotts" and the Commission "ought to conduct such an investigation."[57]

---

[55] Brendan Carr (@BrendanCarrFCC), X (Nov. 14, 2024, 7:19 PM), https://x.com/BrendanCarrFCC/status/1857216731590148365.

[56] *Id.*; *see also* Brendan Carr (@BrendanCarrFCC), X (Nov. 15, 2024, 8:45 AM), https://x.com/BrendanCarrFCC/status/1857419658812440927 ("The censorship cartel must be dismantled."); Brendan Carr (@BrendanCarrFCC), X (Nov. 17, 2024, 8:54 PM), https://x.com/BrendanCarrFCC/status/1858327922810970327 ("We must dismantle the censorship cartel and restore free speech rights for everyday Americans.").

[57] Concurring Statement of Commissioner Andrew N. Ferguson, *FTC v. 1661, Inc. d/b/a GOAT*,

100.    Then-Commissioner Ferguson also posted on X that "[t]he FTC must protect Americas' freedom of speech online. If platforms or advertisers are colluding to suppress free speech in violation of the antitrust laws, the FTC must prosecute them and break up those cartels."[58]

101.    On December 10, 2024, President-elect Trump announced his intent to appoint Ferguson as the Chairman of the FTC.[59]

102.    President-elect Trump posted on Truth Social that "Andrew has a proven record of standing up to Big Tech censorship, and protecting Freedom of Speech in our Great Country . . . he will be able to fight on behalf of the American People on Day One of my Administration."[60]

---

Matter Number 2223016, Fed. Trade Comm'n (Dec. 2, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-goat-concurrence.pdf.
[58] Andrew Ferguson (@AFergusonFTC), X (Dec. 3, 2024, 8:38 AM), https://x.com/afergusonftc/status/1863940797751599579?s=46&t=2yQS3wsEbvI9bCYB3nT64Q.
[59] Donald Trump (@realDonaldTrump), Truth Social (Dec. 10, 2024, 5:58 PM), https://truthsocial.com/@realDonaldTrump/posts/113631003888738065.
[60] *Id.*



← **Truth Details**
181 replies

⋯



**Donald J. Trump** ✓ ➕
@realDonaldTrump

I am pleased to appoint Andrew N. Ferguson to be the next Chair of the Federal Trade Commission. Andrew has a proven record of standing up to Big Tech censorship, and protecting Freedom of Speech in our Great Country. Sworn in as a Commissioner on April 2, 2024, he will be able to fight on behalf of the American People on Day One of my Administration.

Andrew most recently served as Solicitor General of the Commonwealth of Virginia. Prior to Government service, he was an antitrust litigator at several Washington, D.C. law firms. He earned his undergraduate degree and law degree from the University of Virginia. Andrew also clerked for Judge Karen L. Henderson on the U.S. Court of Appeals for the D.C. Circuit, and U.S. Supreme Court Justice Clarence Thomas.

Andrew will be the most America First, and pro-innovation FTC Chair in our Country's History. CONGRATULATIONS ANDREW!

**2.95k** ReTruths   **14.4k** Likes  12/10/24, 5:58 PM

**D. As head of the Commission, Chairman Ferguson escalated the harassment campaign against GDI by launching a retaliatory, unconstitutional investigation into GDI's reporting activities.**

103.    Ferguson was officially designated as Chairman of the Commission on January 20, 2025.[61]

104.    Chairman Ferguson has since surrounded himself with advisors who have expressed similar distaste for the speech of organizations like GDI and Media Matters. For example, Jake Denton, a former Heritage Foundation staffer who is currently serving as Chief Technology Officer of the Commission, posted about the need to dismantle the "censorship industrial complex."[62]

105.    Upon becoming Chair, Ferguson seized the opportunity to wield his new authority to retaliate against GDI, as he previewed in his November 2024 X post.[63]

106.    On April 16, 2025, weeks before the Commission issued its CID to GDI, Trump administration official, Secretary of State Marco Rubio joined The Federalist's retribution campaign by publishing a piece on its site discussing the allegations underlying the *Daily Wire* case and calling out GDI by name.[64]

---

[61] *Andrew N. Ferguson Takes Over as FTC Chairman*, FED. TRADE COMM'N (Jan. 22, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/01/andrew-n-ferguson-takes-over-ftc-chairman.

[62] Jake Denton (@RealJDenton), X (Nov. 24, 2024, 1:55 PM), https://x.com/RealJDenton/status/1860759081138696689.

[63] Andrew Ferguson (@AFergusonFTC), X (Nov. 12, 2024, 8:15 PM), https://x.com/AFergusonFTC/status/1856152760850243905.

[64] Marco Rubio, *Rubio: To Protect Free Speech, The Censorship-Industrial Complex Must Be Dismantled*, THE FEDERALIST (Apr. 16, 2025), https://thefederalist.com/2025/04/16/rubio-to-protect-free-speech-the-censorship-industrial-complex-must-be-dismantled/.

107.     The next day, April 17, 2025, one month before issuing GDI's CID, Ferguson reiterated during a keynote speech that the "risk [of advertiser boycotts] is real and needs to be confronted and taken seriously."[65]

108.     On May 20, 2025, the FTC issued the CID to GDI (and many other organizations as part of the same sweeping investigation), Ferguson reaffirmed that "investigating and policing censorship practices that run afoul of the antitrust laws is a top priority of the Trump-Vance FTC."[66] Chairman Ferguson asserted that the "the supreme evil of antitrust" is "collusion with other firms and the creation of pre-made 'exclusion lists' to encourage advertisers to join *de facto* boycotts coordinated by advertising firms and other third parties."[67]

109.     But GDI is not an advertiser or advertising agency; it is a nonprofit that reports about what is on the internet. What advertisers and agencies do with GDI's reports is up to them.

110.     Chairman Ferguson's public statements accusing GDI of "***censor[ing] the speech of conservative and independent media in the United States***,"[68] combined with the aimlessly overbroad CID issued to a nonprofit that is outside of the FTC's jurisdiction and therefore could never be the target of an FTC investigation, show that the Commission's investigation into GDI is not targeting relevant information to investigate this advertising boycott. This investigation is nothing more than a retaliatory act designed to harass GDI out of operation.

---

[65] *Transcript: FTC Chairman Andrew Ferguson Keynote*, PROMARKET (Apr. 17, 2025), https://www.promarket.org/2025/04/17/transcript-ftc-chair-andrew-ferguson-keynote/.
[66] Statement of Chairman Andrew N. Ferguson, *In the Matter of Omnicom Group / The Interpublic Group of Cos.*, Matter Number 2510049, Fed. Trade Comm'n (June 23, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/omnicom-ipg-ferguson-statement_0.pdf.
[67] *Id.*
[68] Andrew Ferguson (@AFergusonFTC), X (Nov. 12, 2024, 8:15 PM), https://x.com/AFergusonFTC/status/1856152760850243905.

111.    The Commission's CID failed to set out the nature of the Commission's investigation: it literally lacked any explanation of the subject of the investigation, despite Section 57b-1(c)(2) of the FTC Act demanding that "[e]ach civil investigative demand shall state the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation." 15 U.S.C. § 57b-1(c)(2).

112.    Instead, just like the Media Matters CID, the field titled "Subject of Investigation" just says: "See attached." Ex. B. This attachment was a generic statement issued by a previous Commission in mid-2022 setting out a broad resolution to use compulsory service in non-public investigations of collusive practices. The generic statement contained no mention of advertisers, advertising agencies, or even the advertising industry or any specific conduct at any time after mid-2022 that the Commission was, in fact, investigating. On its face, of course, this mid-2022 document contained nothing indicating why the CID sought information from GDI, let alone information for 29 separate document requests going back four and half years before it was even issued.

113.    GDI promptly objected to the CID because of this statutorily defective notice. During a meet and confer with Commission staff on July 14, 2025, GDI objected that the Commission lacks the authority and jurisdiction to enforce the CID because, among other deficiencies, it fails to state the nature of the investigation and provision of law under investigation. Defendants, in an attempt to remedy this deficiency almost two months after issuing the CID, sent a letter to GDI on July 18 describing an extremely broad investigation. This description remains vague on what aspect of the advertising ecosystem is being investigated and why GDI, which is not an advertiser and does not buy advertising, is part of it:

> *To determine whether any natural persons, partnerships, corporations, associations, or other legal entities have engaged in or are engaging in unfair, anticompetitive, collusive, or exclusionary acts or practices— including inviting, participating in, or facilitating boycotts or other collusion or coordination—to withhold, degrade, increase the cost of, or otherwise diminish the quality of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, or Section 5 of the FTC Act, 15 U.S.C. § 45, as amended, or any other statutes or rules enforced by the Commission, and to determine the appropriate action or remedy. See also the attached resolution.*

FTC Staff July 18, 2025 Letter to GDI, Ex. C. at 1.

114.    Media Matters similarly challenged the CID it received from the FTC for failure to include an adequate statement setting out the nature of its investigation and for invasion of its constitutional rights. The FTC's Opposition stated:

> *The CID issued to Media Matters is part of a broader investigation into similar group boycotts in the advertising industry. In particular, it is one of seventeen still outstanding CIDs issued pursuant to the agency's investigation into whether various entities have conspired to withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act . . . and Section 5 of the FTC Act, under the guise of promoting "brand suitability" and "brand safety" against "misinformation." In particular, the Commission is investigating whether online advertisers and/or advertising agencies have unlawfully agreed to use certain lists promulgated by other industry participants that categorize or rate content publishers as not "brand suitable" or not "brand safe," to coordinate the placement of ads. Accordingly, the Commission has issued CIDs both to advertising agencies and to other entities that the Commission has reason to believe possess information relating to the use of such lists to coordinate ad placement. The entities receiving CIDs include several advertising trade associations, several brand safety/suitability rating organizations, and several policy/advocacy groups—such as Media Matters.*

*Media Matters for Am.*, 2025 WL 2378009 at *21 (D.D.C.) (quoting Defs.' Opp'n at 28 (cleaned up)). As here, the Defendants modified the nature of their investigation, a modification the district court subsequently determined was not only inadequate, but "[did] not inspire confidence that they [the Commission] acted in good faith" and failed to "explain *why* they have 'reason to believe'

38

that Media Matters has 'information relating to the use of … lists to coordinate ad placement.'" *Id.* at \*21.

115.    The Commission likewise has not explained why nonprofit GDI has information relevant to this purported advertiser or advertising agency boycott, or why any relevant information could not be obtained directly from the advertisers or agencies who were members of the supposed conspiracy (and without burdening a nonprofit or invading its First Amendment rights). During the meet and confer process, Commission staff were similarly unable to explain.

116.    GDI is not an advertiser or advertising agency, and has never purchased, sold, or brokered advertising. GDI did not enter into agreements with any advertiser or advertising agency that required them to spend (or not spend) their dollars in any particular way or to do business (or not do business) with any particular website or publisher. Instead, GDI simply provided reports of its research to its subscribers and clients who were free to do whatever they wanted with it via their own independent decision-making.

117.    The Commission's original CID contained 29 document requests broadly calling for GDI to produce records relating to the most sensitive areas of GDI's reporting, including all aspects of its operations for more than seven years, dating back to its founding. *See* Ex. B.

118.    The modified CID did not narrow these requests *i.e.*, its 29 requests for documents going back more than seven years to January 2018 continued to broadly call for GDI to produce records relating to all aspects of its operations throughout its existence. *See* Ex. C.

119.    Not one of the CID's requests called for any information about agreements between and among advertisers or advertising agencies

120.    We submit that is because the FTC is aware that GDI has no such information

or such agreements and recognizes that GDI was operating lawfully, but has created this CID in an attempt to overwhelm GDI as a small organization, and thereby put it out of business.[69]

121.    GDI conferred with Commission staff on June 4, June 5, June 6, June 10-11, June 16, July 9, July 11, July 14, July 18, July 23, August 4, August 26, August 28, September 12, and September 15 to discuss the scope, burden, and unconstitutionality of the CID.

122.    On June 10, 2025, GDI produced information responsive to Specifications 1, 2, and 3, namely the Certificate of Incorporation of Disinformation Index, Inc., establishing GDI's status as a registered nonprofit under 26 U.S.C. § 501(c)(3), without waiving any of its objections, rights or privileges. Ex. D at Ex. 3 (Certificate of Incorporation of Disinformation Index).

123.    During the meet and confer process, GDI objected to the CID on July 14, 2025, stating that the Commission lacks the authority and jurisdiction to enforce the CID because it does not state the nature of the investigation and provision of law under investigation, improperly seeks documents and information from a nonprofit where the Commission lacks jurisdiction and violates GDI's First Amendment rights.

124.    GDI also objected that the CID is overbroad, vague, and includes undefined terms. *See* Ex. D at Ex. 1 (Statement of Counsel).

125.    The Commission does not have authority to enforce antitrust laws against nonprofits. The FTC Act limits the Commission's enforcement jurisdiction to entities "organized to carry on business for [their] own profit or that of [their] members." 15 U.S.C. §§ 44–45; *Nat'l Federation of the Blind v. FTC*, 420 F.3d 331, 334 (4th Cir. 2005) (holding that nonprofits "fall outside the scope of the agency's jurisdiction").

126.    Undeterred by this limit on its authority or by this Court's decision to enjoin the

---

[69] Specification 9 calls for GDI's communications with its customers/subscribers, which is different from an agreement between and among advertisers or advertising agencies. *See* Ex. C.

Media Matters CID, the Commission has refused to retract its CID and has declined to amend the requests that infringe on GDI's First Amendment rights.

127.    On September 17, 2025, GDI timely filed a petition to quash the Commission's retaliatory CID in its entirety. *See* Ex. D.

128.    GDI is a nonprofit, and the Commission does not have enforcement authority over nonprofits, regardless of the true subject of the Commission's boundless investigation.

**E. The Commission's CID has harmed and will continue to irreparably harm GDI.**

129.    GDI has suffered irreparable harm since the Commission issued the CID, and it will continue suffering irreparable harm unless this Court grants relief.

130.    The CID has chilled GDI from engaging in speech protected by the First Amendment by deterring GDI from publishing additional research and reports on disinformation risks out of fear that doing so will provoke further government harassment and retaliation.

131.    This chilling effect has silenced GDI's constitutionally protected speech and undermined its ability to fulfill its mission of promoting information integrity.

132.    The harm suffered by GDI as a result of the Commission's investigation is not hypothetical, it is a direct consequence of escalating government-led harassment and public attacks targeting organizations engaged in disinformation research. As Dr. Mary Anne Franks, Professor at George Washington Law School and President of the Cyber Rights Initiative, testified before Congress, researchers who study disinformation "are being vilified, defunded, harassed, and threatened, including by members of Congress."[70]

---

[70] *Under the Microscope: Examining the Censorship-Industrial Complex and its Impact on American Small Businesses*, U.S. HOUSE OF REPRESENTATIVES SMALL BUSINESS COMM. HEARING, Written Testimony of Dr. Mary Anne Franks at 3 (June 24, 2024), https://democrats-smallbusiness.house.gov/uploadedfiles/06-26-24_dr._franks_testimony.pdf.

133.     This retaliation has now escalated through Chairman Ferguson's investigation, the Commission—the federal government—is participating directly in this harassment campaign. This is exactly what Chairman Ferguson promised to do leading up to his appointment by President Trump.

134.     This Court has expressed that "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Paxton*, 138 F.4th at 585 (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). And just like Media Matters, GDI "is 'suffering from a campaign of retaliation against [it] in response to [its] exercise of [its] First Amendment rights,' which is 'an irreparable injury.'" *Media Matters for Am.*, 2025 WL 2378009 at *22 (D.D. C.) (quoting *Paxton*, 138 F.4th at 585 (citing *Cate v. Oldham*, 707 F.2d 1176, 1188-89 (11th Cir. 1983)).

135.     As a direct consequence of the Trump FTC's retaliatory investigation, GDI's funding sources became and continue to be wary of the political climate and supporting an organization that is being harassed by the federal government.

136.     Following the statements made by Ferguson and other Trump-appointed officials targeting GDI around the 2024 election, funders advised GDI to come back to them in 2025. Ultimately, however, the funders have continued to decline to fund GDI's nonprofit operations in the United States.

137.     Since November 2024, GDI's funding has been reduced by approximately 50%, amounting to a loss of about $1 million.

138.     Without this critical support, GDI was unable to invest in its core products or sustain the technology necessary for its mission.

139.     The lack of funding has forced GDI to almost entirely cease its reporting

activities and curtail its work as a nonprofit in the United States.

140.    GDI's funding losses were not the result of any failure to fulfill its mission, or lack of demand for work. Rather, the losses were the direct result of coordinated attacks and federal government harassment.

141.    Because of this retaliation campaign, GDI at present does not have the resources required to carry out its nonprofit mission, nor continue the work for which it was established, and it is at risk of ceasing its operations all together.

142.    GDI to date has been unable to identify a sustainable path forward for its United States nonprofit operations and has paused its reporting activities in the United States.

143.    The CID demands extensive documentation of GDI's finances, editorial processes, researching activities, and communications with third parties. Ex. C.

144.    The breadth and intrusiveness of these demands to GDI are practically identical to those called for in Media Matters' CID—in relation to which this Court has already determined that "[i]t is hard to imagine any media company not being chilled by this sweeping and sensitive CID." *Media Matters for Am.*, 2025 WL 2378009 at *18 (D.D.C.). And in fact, GDI's CID includes nine more requests than the CID issued to Media Matters.

145.    As a nonprofit organization, GDI operates outside the scope of the Commission's jurisdiction, and it cannot be a target for such investigations. 15 U.S.C. §§ 44–45; *Nat'l Federation of the Blind v. FTC*, 420 F.3d 331, 334 (4th Cir. 2005) (holding that nonprofits "fall outside the scope of the agency's jurisdiction"). GDI's core function was to gather and provide data for independent analysis and decision-making by advertisers, not to control or direct their actions.

146.    Despite GDI's nonprofit status, Chairman Ferguson and the Trump FTC has

targeted GDI in a manner that has effectively silenced the organization as GDI has paused carrying out research, publishing reports like the media market review, and providing data through the DEL. GDI has lost $1 million in funding since November 2024 because of these threats and harassment by Chairman Ferguson and the Trump FTC.

147.    The Commission's actions under Chairman Ferguson raise serious concerns about infringement of First Amendment rights and the improper use of executive authority and investigative powers.

148.    Chairman Ferguson spoke out against GDI before he was selected as the Chairman, and once he assumed power, he launched this retaliatory investigation to punish GDI for engaging in First Amendment protected conduct: reporting about false, misleading, and even sometimes violent content published on websites.

## CLAIMS FOR RELIEF

## COUNT I

### (Retaliation in Violation of the First Amendment)

149.    Plaintiff incorporates paragraphs 1 through 148 above as if set forth fully herein.

150.    Defendants violated, and continue to violate, Plaintiff's First Amendment rights by launching an investigation and serving a burdensome CID in retaliation for Plaintiff's speech, press, and associational activities. Chairman Ferguson's use of the power of the Commission is discouraging, and will continue to discourage, Plaintiff from carrying out research and providing data. GDI has faced financial, resourcing, and associational harms in addition to a chilling effect on its speech activities.

151.    The unconstitutional nature of this CID has already been determined by this Court, which found that the CID issued to Media Matters, which bears the same FTC File No. 251-0061 and is part of the same investigation as the CID issued to GDI. *See Media Matters for Am.*,

2025 WL 2378009 at *16 (D.D.C.) (recognizing that "[a] reporter of ordinary firmness would be wary of speaking again if she had to reveal the materials requested by this fishing expedition of a CID").

152.    "[T]he law is settled that … the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). The government "cannot … use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024).

153.    To prevail on a retaliation claim, a plaintiff must show: "(1) he engaged in conduct protected under the First Amendment; (2) the defendants took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 844 F.3d 242, 258 (D.C. Cir. 2016) (cleaned up).

154.    Defendants' investigation represents just the latest escalation incident in a broader pattern of current and former Trump administration officials harassing and attempting to intimidate GDI out of expressing itself. *See Back Beach Neighbors Comm. v. Town of Rockport*, 535 F. Supp. 3d 57, 65 (D. Mass. 2021) ("A pattern of informal harassment can support a First Amendment retaliation claim if the alleged harassment has a chilling effect.").

155.    GDI, a nonprofit research organization that publishes reports to the public, is "obviously engaged in conduct protected under the First Amendment." *Paxton*, 138 F.4th at 584. Just like Media Matters, GDI's public reporting is, in this Court's words, a "quintessential First Amendment activit[y]." *Id.* GDI produced its reports to create transparency on the internet. There is no requirement for any of GDI's subscribers to do anything with its reports—GDI would simply scan the internet using a proprietary algorithm and report on its findings. GDI's subscribers would

then make their own decisions, based on individual preferences and business needs, about how to use that information (or whether to disregard the information entirely).

156.    Chairman Ferguson, other current and former Trump administration officials, and disgruntled media sites named in GDI's reports have targeted GDI and other media reporting nonprofits, such as Media Matters, launching a view-point-based battle charged by groundless conspiracy theories attacking internet transparency and First Amendment protected reporting.

157.     Before assuming his current position of power at the Commission, Chairman Ferguson publicly admitted that he intends to punish GDI for its mission of creating transparency on the internet through its reporting.

158.    Chairman Ferguson latched onto the narrative pushed by the *Daily Wire* litigation—which includes many incorrect allegations about GDI—and parroted the claims that receiving the State Department's GEC grants, "the Global Disinformation Index and NewsGuard … led collusive ad boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States."[71]

159.    Now with the issuance of the Commission's CID, Defendants have taken actions adverse to GDI's protected activity in response to its disinformation reports. *Media Matters for Am.*, 2025 WL 2378009 at *18 (D.D.C.) ("[T]he Court sees no reason why the FTC's CID cannot amount to a sufficient retaliatory act as a matter of law.").

160.    Defendants' investigation and intrusive 29-request CID have already chilled Plaintiff's speech and reporting activities, and they will continue to do so absent relief. Defendants' retaliatory conduct would "deter a person of ordinary firmness in [Plaintiff's] position from speaking again." *Aref*, 833 F.3d at 258.

---

[71] Andrew Ferguson (@AFergusonFTC), X (Nov. 12, 2024, 8:15 PM), https://x.com/AFergusonFTC/status/1856152760850243905.

161.    Establishing that a person of "ordinary firmness" would be deterred from speaking is "not a high" bar to clear. *Jenner & Block LLP v. U.S. Dep't of Just.*, No. CV 25-916 (JDB), 2025 WL 1482021, at *7 n.7 (D.D.C. May 23, 2025). It is reasonable to expect any similarly situated reporting organization—especially one facing a multi-front attack from government officials and receiving a barrage of threats from powerful figures and their allies—would be deterred from reporting activities. *See Media Matters for Am.*, 2025 WL 2378009 at *15 (D.D.C.) (citing *White v. Lee*, 227 F.3d 1214, 1228–29 (9th Cir. 2000) (holding an "investigation by . . . HUD officials" "more than meets" the standard requiring an act that "would chill or silence a person of ordinary firmness from future First Amendment activities" where the defendants "directed the plaintiffs under threat of subpoena to produce all their publications regarding [a certain] project, minutes of relevant meetings, correspondence with other organizations, and the names, addresses, and telephone numbers of persons who were involved in or had witnessed the alleged discriminatory conduct"); *Cooksey v. Futrell*, 721 F.3d 226, 236–37 (4th Cir. 2013) (holding "[a] person of ordinary firmness would surely feel a chilling effect" where an official told the plaintiff "that he and his website were under investigation and that the State Board does have the statutory authority to seek an injunction[.]") (cleaned up)).

162.    Finally, Chairman Ferguson's retaliatory animus is the but-for cause of GDI's injury. "To establish causal link, it is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d. 1, 28 (D.D.C. Apr. 12, 2024) (cleaned up). "Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* (cleaned up); *see also Hartman*, 547 U.S. at 256 ("[W]e have held that retaliation is subject to recovery as the but-for cause of official action offending the

Constitution.").

163.    Defendants' investigation and CID are causally linked to Chairman Ferguson's retaliatory motive to punish GDI's exercise of its First Amendment rights.

164.    The scope of the CID here sweeps broadly to target GDI's internal decision-making regarding its research and reporting of disinformation online. Only one of the twenty-nine specifications in the CID (Specification 9) requests documents that are arguably related to the alleged advertising cartel the Commission is investigating: communications between GDI and advertisers or advertising agencies. But tellingly, during the meet and confer process, the Commission staff did not highlight this request as a priority. Regardless, any information provided by GDI in response to Specification 9 would infringe upon GDI's First Amendment rights—reinforcing that the true purpose of the Commission's investigation is not to root out an advertiser cartel or advertising agency cartel but to punish GDI's exercise of free speech. The Commission demands documents overwhelmingly concerning GDI's business and internal decision making, which self-evidently would include extensive information that is unrelated to any U.S. advertising industry boycott the Commission purports to be investigating, and would sweep up GDI's First Amendment protected information. *Id.* ("[The CID] also includes other demands that go well beyond the investigation's purported scope.").

165.    As the four corners of the CID shows, the Defendants' given reasons for bringing this investigation and issuing the CID, which have morphed over time (yet still never providing a satisfactory response that would provide GDI with sufficient notice of what the CID is actually seeking) are pretext. *See id.* The CID, as issued on May 20, 2025, did not provide the required description of the nature of the conduct under investigation. *See* 15 U.S.C. § 57b-1(c)(2) ("Each [CID] shall state the nature of the conduct constituting the alleged violation which is under

investigation and the provision of law applicable to such violation."). Instead, as alleged above, just like the *Media Matters* CID, the field titled "Subject of Investigation" just says: "See attached." Ex. B. The attachment consisted of a generic FTC Resolution that was issued by a previous Commission in mid-2022 that authorized it to investigate anyone for "facilitating collusion or coordination in any way with any other market participant"—effectively authorizing the Commission to investigate collusive practices in ***any*** market with ***any*** participant. Defendants, attempting to remedy this deficiency almost two months later, issued a letter to GDI on July 18 describing an extremely broad investigation. Ex. C. The Court's reasoning in *Media Matters* regarding the July 7 modification letter applies equally here: "The late-breaking nature of [Defendants' July 7 letter] explanation cuts in favor of finding pretext." *Media Matters for Am.*, 2025 WL 2378009 at *21 (D.D.C.).

166.    The Defendants' explanation proffered in its Opposition papers in the *Media Matters* litigation, as alleged above, further "[did] not inspire confidence that they acted in good faith" and failed to "explain *why* they have 'reason to believe' that Media Matters has 'information relating to the use of … lists to coordinate ad placement.'" *Id.* The Commission likewise has not explained why nonprofit GDI, who cannot be a target of an investigation, has information relevant to this advertiser or advertising agency boycott.

167.    The Trump FTC's CID was issued in the context of "a pattern of litigation and information demands targeted    at [GDI]" as well as online harassment that has "spanned virtually every day of the two years since" its release of its December 2022 U.S. media market review identifying websites with a high risk for disinformation. *Media Matters for Am.*, 2025 WL 2988966 at *6 (D.C. Cir.). This pattern of demands to GDI includes the *Daily Wire*'s "facially overboard" subpoena and the House Investigation and Interim Staff Report.

168.     In November 2024, then-Commissioner Ferguson named GDI in an X post that

parroted the theories from the *Daily Wire* litigation and House Interim Staff report, claiming "the

Global Disinformation Index and NewsGuard . . . led collusive ad boycotts—possibly in violation

of our antitrust laws—to censor the speech of conservative and independent media in the United

States."  Ferguson made this X post while he was "seeking the position of Commission Chair" and

also made other statements "of his intent to target media groups and other actors in language that

focuses on their viewpoints and the content of their speech." *Media Matters for Am.*, 2025 WL

2988966 at *8 (D.C. Cir.). As the D.C. Circuit discussed when finding the district court adequately

determined a likelihood of retaliation:

> In a "leaked memo" supporting his candidacy for Chair, then-Commissioner
> Ferguson stated that he would "stand[ ] up to * * * the radical left" and
> "**[i]nvestigate** * * * advertiser boycotts[.]" *Opinion*, at *4, *19 (emphasis added);
> Compl. ¶ 59. Then, just ten days before he was appointed to be the incoming Chair, Mr.
> Ferguson stated directly that "it's really important that
> the **FTC** take **investigative** steps in the new administration" because
> "progressives" who are "fighting disinformation" are "not going to give up just
> because of the election[.]" *Opinion*, at *1, *4, *19–20; Compl. ¶ 61. The Demand
> issued in the early months of Chairman Ferguson's tenure.

*Id.*

169.     Ferguson's November 2024 X post specifically naming GDI creates an even

closer connection in this case than was found to exist in *Media Matters*. *Cf. id.* at *11 (Walker,

C.J., dissenting) ("And never mind that the record does not include a single statement about Media

Matters by any decisionmaker at the FTC before the FTC's investigation.").

170.     At least five other current, former, and future Trump administration officials—

Marco Rubio, Elon Musk, Brendan Carr, Mike Benz, Matt Gaetz—have also publicly criticized

GDI.

171.     The timing of the CID also demonstrates the retaliatory animus of the

Commission under Chairman Ferguson. *See Media Matters for Am.*, 2025 WL 2378009 at *20 (D.D.C.) (finding that "the timing suggests the CID was motivated by retaliatory animus"). Chairman Ferguson wasted no time initiating this investigation into alleged "tech [platform] censorship," which he announced a month after taking office as Chairman. *Id.* This CID was issued to GDI by May 2025. Just as this Court found in *Media Matters* the "expedition" with which Chairman Ferguson moved to issue the CID to GDI (as with Media Matters) demonstrates the causal link between his animus and this investigation. *Id.*

172.    The Commission has subpoenaed at least 17 organizations in this investigation. The Commission can presumably get the information it seeks directly from the advertisers and agencies it is investigating—or it should at least seek information from the advertising industry first to determine "whether online advertisers and/or advertising agencies have unlawfully agreed to use certain lists." *Id.* at *21 (quoting Defs.' Opp'n at 28). Rather than directly investigating the advertising industry the Commission is targeting, almost all of the CID's requests seek GDI's First Amendment protected information.

173.    The disconnect between the CID's specifications and the Trump FTC's investigation is stark—the vast majority of the Specifications are not relevant and seek First Amendment privileged information. The sweeping "scope of the CID suggests pretext on the part of the FTC." *Id.* at *21. This investigation is nothing more than a broad retaliatory campaign against GDI, Media Matters, and other nonprofits, to chill and punish them for their First Amendment protected reporting about what is on the internet. This weaponization of the Commission's powers is unconstitutional and should not be tolerated.

174.    Defendants' ongoing violations of GDI's First Amendment rights will continue to cause GDI irreparable harm absent judicial relief. *CTIA – The Wireless Ass'n v. City of Berkeley*,

928 F.3d 832, 851 (9th Cir. 2019) ("A party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim."). The Trump FTC's CID has chilled GDI from engaging in speech protected by the First Amendment by deterring GDI from publishing additional research and reports on disinformation risks out of fear that doing so will provoke further government harassment and retaliation. GDI has lost $1 million in funding, and this lack of funding has forced GDI to almost entirely cease its reporting activities and curtail its work as a nonprofit.

175.    Plaintiff GDI is therefore entitled to (1) a declaration that Defendants' CID constitutes a First Amendment retaliatory action in violation of Plaintiff's rights under the First Amendment of the U.S. Constitution, and (2) preliminary and permanent injunctive relief enjoining Defendants and their officers, agents, servants, and employees from initiating any action to enforce the CID or further investigating Plaintiff in violation of its constitutional rights.

## COUNT II

### (Improper Investigation in Violation of the First and Fourth Amendments)

176.    Plaintiff incorporates paragraphs 1 through 148 above as if set forth fully herein.

177.    The Commission's overbroad and retaliatory CID violates GDI's First and Fourth Amendment rights by forcing it to disclose its sources, methods, and internal research—core elements protected by the First Amendment—that GDI used in its DEL, open-source intelligence hub, and research reports.

178.    The Commission's "[s]ubpoena enforcement power is not limitless." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 586 (D.C. Cir. 2001). The Fourth Amendment places limits on administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). An "investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." *United States v. Morton Salt*

*Co.*, 338 U.S. 632, 652 (1950).

179.    The enforcement of a CID requires that the CID is reasonable in the "nature, purposes, and scope of the inquiry." *Okla. Press Pub. Co.*, 327 U.S. at 209. The CID must not be "unduly burdensome or unreasonably broad," so that "compliance threatens to unduly disrupt or seriously hinder normal operations of business." *FTC v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977). A CID is only enforceable if "the demand is not too indefinite, and the information sought is reasonably relevant." *Morton Salt Co.*, 338 U.S. at 652.

180.    Where the disclosure of materials responsive to an administrative subpoena "may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)). The Commission has shown no "scrupulous exactitude" in issuing the CID, instead demanding a broad set of documents in violation of nonprofit GDI's First Amendment rights.

181.    Further, this Court has already determined that a similar CID, with the same FTC matter number as GDI's CID, was "sweeping." *See Media Matters for Am.*, 2025 WL 2378009 at *1 (D.D.C.) (explaining that the Commission also "issued a sweeping CID to Media Matters, purportedly to investigate an advertiser boycott concerning social media platforms"). And as discussed in *Media Matters*, the Commission's CID goes even further in seeking privileged materials than the CID Media Matters received from the Texas Attorney General, which the D.C. Circuit called "sweeping." *Id.*; *Paxton*, 138 F.4th at 569.

182.    The Court should similarly find that the Commission's CID to GDI is an excessive fishing expedition into the most sensitive areas of GDI's reporting that causes it undue burden. *See id.* at *15 (finding that "the FTC issued a sweeping and burdensome CID calling for

sensitive materials"). Critically, the purported subject of the investigation does not align with the specifications in the CID. *See generally Livingston v. Copart of Conn., Inc.,* 2020 U.S. Dist. LEXIS 248008, 2020 WL 8167497 at *4 (D.S.C. May 21, 2020) ("[A] subpoena that seeks information irrelevant to the case is a per se undue burden."). The subject of the investigation as modified is whether there is an advertiser boycott for "news outlets, media platforms, or other publishers." Ex. C; *see Media Matters for Am.*, 2025 WL 2378009 at *1 (D.D.C.) (explaining that the Commission also "issued a sweeping CID to Media Matters, purportedly to investigate an advertiser boycott concerning social media platforms"). There is no specification in the CID that requests information relevant to uncovering the existence of any agreements between or among advertisers or advertising agencies.

183.    Only one of the twenty-nine specifications in the CID (Specification 9) requests documents arguably related to the alleged advertising cartel the Commission is investigating: communications between GDI and advertisers or advertising agencies. But tellingly, during the meet and confer process, the Commission staff did not highlight this specification as a priority. Regardless, any information provided by GDI in response to Specification 9 would infringe upon GDI's First Amendment rights—reinforcing that the true purpose of the Commission's investigation is not to root out an advertiser cartel or advertising agency cartel but to punish GDI's exercise of free speech.

184.    Instead of aiding the investigation, Specification 9 only places an unconstitutional burden on GDI as the Commission can get any relevant information directly from any advertiser or agent they allege may be participating in an advertiser boycott. This is illustrated by the Commission's own statement in their denial of Media Matters' petition to quash, in which the Commission states that they are investigating whether advertisers or advertising agencies

agreed to use certain lists to boycott placing advertisements. *See In re Civil Investigative Demand to Media Matters for America*, Order Denying Petition to Quash Civil Investigative Demand, FTC File No. 251-0061 at 2 (July 25, 2025). Therefore, placing the burden of producing these documents on GDI is superfluous and unnecessarily burdensome to GDI.

185.    During the meet and confer process, when pressed on which specifications of the twenty-nine actually related to the Commission's priorities, staff was only able to come up with two—Specifications 10 and    22.

186.    Specification 10 requests that GDI

> Provide all documents relating to other entities that purport to track, categorize, evaluate, or rate news sources, outlets, websites, content, or other entities for "misinformation," "hate speech," "false" or "deceptive" content, or similar categories, including but not limited to communications between GDI, or any of GDI's clients, and any person connected to those entities, including but not limited to [a list of 13 entities, including Media Matters for America].

Ex. C at 2.

187.    And Specification 22 requests that GDI

> Provide all documents relating to GDI working with ad tech, technology, or developer companies to develop and advance GDI's programs, policies, and objectives, including but not limited to any agreements between GDI and these companies.

Ex. C at 4.

188.    Both of these Specifications, in addition to being exceptionally broad and not targeted to relevant information that GDI may have as a third-party to the purported advertising industry boycotts, go to the core of GDI's First Amendment rights, however, and the Commission staff refused to modify these specifications to not invoke GDI's First Amendment rights.

189.    GDI was a fact-gathering organization that compiled and shared transparent data to help its subscribers make informed economic decisions. It has never bought, sold, or

brokered advertisements, nor did it contract with advertisers or advertising agencies with any requirement that they buy or not buy advertisements on any particular website. GDI's subscribers remained free to use or not use the information provided by GDI in whatever manner they pleased. GDI's subscribers were under no obligation to adhere to the information provided by GDI.

190.     There is no legitimate, constitutional justification for the Commission's invasive demands. Forcing compliance would not only violate GDI's First Amendment rights by compelling disclosure of protected sources, methods, and internal research, but would also undermine the constitutional protections afforded to fact-gathering institutions. Any limited information that might be relevant to an advertiser or advertising agency agreement to use certain lists—which would still invade GDI's First Amendment rights—is better sought directly from an advertiser or advertising agency to avoid infringing on GDI's constitutionally protected rights and causing undue burden.

191.     The CID further violates GDI's constitutional rights by seeking to compel disclosure of reporting materials, which "presents a straightforward First Amendment violation." *Media Matters for Am.*, 2025 WL 2378009 at *1–4 (D.D.C.) (finding that the First Amendment protection applies to a related CID issued by the Commission). The First Amendment protects reporting organizations from being forced to reveal information gathered in the course of their reporting. *See Hutira v. Islamic Republic of Iran*, 211 F. Supp.2d 115, 118 (D.D.C. July 9, 2002) ("[T]he First Amendment provides journalists with a qualified privilege against compelled disclosure of information obtained through their news gathering activities."); *see also Perry v. Schwarzenegger*, 591 F.3d 1147, 1156 (9th Cir. 2010) (finding that compelled disclosure of materials protected by the First Amendment can have a "profound chilling effect"). This protection is a vital safeguard provided under the First Amendment. *See, e.g., Zerilli v. Smith*, 656 F.2d 705,

710 (D.C. Cir. 1981) ("The First Amendment guarantees a free press primarily because of the important role it can play as a vital source of public information.") (internal citation omitted); *Shoen v. Shoen*, 48 F.3d 412, 415–16 (9th Cir. 1995) (finding that compelled "disclosure of research materials poses a serious threat to the vitality of the newsgathering process"). If reporters feared their ability to gather information, "citizens would be far less able to make informed political, social, and economic choices" because the quantity of truthful sources would inevitably decline. *Zerilli*, 656 F.2d at 711; *see also Zurcher*, 436 U.S. at 564 (reasoning that "the processing of news and its dissemination will be chilled by the prospects that searches will disclose internal editorial deliberations").

192.    This protection may only be infringed in limited circumstances as "the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired." *Zerilli*, 656 F.2d at 711–12 ("[I]f the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished."). Courts have found that journalists may be forced to disclose newsgathering information if "the private interest in compelling disclosure" outweighs "the public interest in protecting the reporter's sources." *Hutira*, 211 F. Supp. 2d at 118–19 (quoting *Zerilli*, 656 F.2d at 712); *see also Shoen v. Shoen*, 48 F.3d 412, 415 (9th Cir. 1995) ("the process of deciding whether the privilege is overcome requires that 'the claimed First Amendment privilege and the opposing need for disclosure be judicially weighed in light of the surrounding facts, and a balance struck to determine where lies the paramount interest.'") (quoting *Shoen v. Shoen*, 5 F.3d, 1289, 1292–93 (9th Cir. 1993) and *Farr v. Pitchess*, 522 F.2d 464, 468 (9th Cir. 1975)).

193.    A reporter may invoke this protection when they had "the intent to use material – sought, gathered or received – to disseminate information to the public and that such intent

existed at the inception of the newsgathering process." *Von Bulow v. Von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987); *see also Shoen*, 5 F.3d at 1293–94. The privilege is protected "regardless of the medium used to report the news to the public." *Shoen*, 5 F.3d at 1293. The purpose of the journalist privilege is to protect "investigative reporting." *Id.* (emphasizing that the purpose of the journalistic privilege "was not solely to protect newspaper or television reporters, but to protect the activity of 'investigative reporting' more generally.") (quoting *Von Bulow*, 811 F.2d at 142–43).

194.    GDI's research reports and disinformation resources "on public issues are quintessential First Amendment activities" that afford GDI first amendment privilege. *Paxton*, 138 F.4th at 584; *Matters for Am.*, 2025 WL 2378009, at *15 (D.D.C.); *see also Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions."); *Roth v. United States*, 354 U.S. 476, 484 (1957) ("The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.").

195.    The Commission's information requests in the CID, which force GDI to disclose its research and reporting to the Commission, violate GDI's First Amendment Rights. GDI produced documents responsive to Specifications 1, 2, and 3, which relate to GDI's incorporation and government records demonstrating its nonprofit status. But forcing GDI to comply with the remainder of the CID would compel disclosure of confidential resource materials.

196.    Similar specifications in the Media Matters CID, which bears the same FTC

matter number as GDI's CID (FTC File No. 251-0061), have already been found to unconstitutionally seek a reporter's resource materials. *Media Matters for Am.*, 2025 WL 2378009, at \*16 (D.D.C) (recognizing that "[a] reporter of ordinary firmness would be wary of speaking again if she had to reveal the materials requested by this fishing expedition of a CID").

197.    For example, Specifications 1, 2, 3, 4, 7, 8, 10, 13, 14, 22, 23, 25 and 29 are practically identical to the Media Matters CID, which was found to cause the disclosure of the Media Matter's sources, methods, and internal research. *See, e.g.*, *id.* at \*16 ("Provide all communications between Media Matters and any other person regarding any request for Media Matters to label any news, media, sources, outlets, platforms, websites, or other content publisher entities for 'brand suitability,' 'reliability,' 'misinformation,' 'hate speech,' 'false' or 'deceptive' content, or similar categories, regardless of whether the request was fulfilled."); *id.* at \*16 ("Provide documents sufficient to show the methodology by which Media Matters evaluates or categorizes any news, media, sources, platforms, outlets, websites, or other content publisher entities."); *id.* at \*16 ("Provide all documents, including correspondence, relating to Media Matters working with ad tech, technology, or developer companies or social media platforms to develop or advance any of [Media Matters'] programs, policies, or objectives, including but not limited to any agreements between Media Matters and these companies."); *id.* at \*16 ("Provide all analyses or studies that Media Matters conducted, sponsored, or commissioned relating to advertising on social media or digital advertising platforms, including but not limited to any financial analyses or studies, and all data sets and code that would be necessary to replicate the analysis.").

198.    The Court should find that the First Amendment protects GDI from being forced to disclose its resources, sources, methods, and other information. There is no compelling reason for the Commission's invasion of GDI's constitutional rights, especially given that the

Commission lacks the authority to enforce the antitrust laws against nonprofits like GDI.

199.    Defendants' ongoing violations of Plaintiff's First and Fourth Amendment rights will continue to cause it irreparable harm absent judicial relief. Plaintiff GDI is therefore entitled to (1) a declaration that that Defendants' CID violates Plaintiff's rights under the First and Fourth Amendments of the U.S. Constitution, and (2) preliminary and permanent injunctive relief enjoining Defendants, their officers, agents, servants, and employees from initiating any action to enforce the CID or further investigating Plaintiff in violation of its constitutional rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter an order or judgment in favor of Plaintiff and against Defendants as follows:

a)    Declare that pursuant to 15 U.S.C. §§ 44–45 the Commission does not have jurisdiction over Plaintiff because of its nonprofit status.

b)    Declare that the Defendants' CID served by the Federal Trade Commission to Disinformation Index, Inc. dated May 20, 2025 and modified on July 18, 2025 constitutes a First Amendment retaliatory action in violation of Plaintiff's rights under the First Amendment of the U.S. Constitution.

c)    Declare that Defendants' CID dated May 20, 2025 and modified on July 18, 2025 violates Plaintiff's rights under the First and Fourth Amendments of the U.S. Constitution.

d)    Preliminarily and permanently enjoin Defendants, their officers, agents, servants, and employees from initiating any action to enforce the CID or further investigating Plaintiff in violation of its constitutional rights.

e)    Grant such other and further relief as this Court deems just and proper.

Dated: November 25, 2025                    Respectfully submitted,


                                            **CLIFFORD CHANCE US LLP**

                                            */s/ Joseph A. Ostoyich*
                                            Joseph A. Ostoyich (DC Bar # 436157)
                                            William Lavery (DC Bar # 503292)**
                                            Danielle Morello (DC Bar # 1032537)
                                            Dorothea R. Allocca (DC Bar # 90010668)*
                                            Kaia Pankey (DC Bar # 90020207)*
                                            Ross Jablon (DC Bar # 90023468)*
                                            2001 K Street NW, Ste. 900
                                            Washington, DC 20006
                                            (202) 912-5533
                                            joseph.ostoyich@cliffordchance.com
                                            william.lavery@cliffordchance.com
                                            danielle.morello@cliffordchance.com
                                            dodi.allocca@cliffordchance.com
                                            kaia.pankey@cliffordchance.com
                                            ross.jablon@cliffordchance.com

                                            *Admission pending
                                            **Application for pro hac vice pending

                                            *Attorneys for Disinformation Index, Inc.*