# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DISINFORMATION INDEX, INC.,
1206 Orange Street
Wilmington, DE 19801

       *Plaintiff,*

  v.

FEDERAL TRADE COMMISSION; ANDREW
N. FERGUSON, in his official capacity as
Chairman of the Federal Trade Commission;
MARK R. MEADOR, in his official capacity as
Commissioner of the Federal Trade Commission;
JOHN DOE 1, in their official capacity as
Commissioner of the Federal Trade Commission;
JOHN DOE 2, in their official capacity as
Commissioner of the Federal Trade Commission;
and JOHN DOE 3, in their official capacity as
Commissioner of the Federal Trade Commission,
600 Pennsylvania Ave. NW
Washington, DC 20580

       *Defendants.*

Civil Case No. 1:25-cv-04137-SLS

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

INTRODUCTION ............................................................................................................ 1

BACKGROUND ........................................................................................................... 3

    A.   GDI is a nonprofit research organization that publishes reports on the risks of disinformation. ................................................................................................................ 3

    B.   GDI has been attacked by the Trump Administration and its allies for GDI's First Amendment protected speech. .................................................................................... 4

    C.   Defendants Ferguson and the Commission joined the anti-GDI harassment campaign..... 8

    D.   Defendants Ferguson and the Commission ramped up the anti-GDI harassment campaign by launching a retaliatory investigation into GDI's media reporting activities. ...................... 11

    E.   The Commission's unconstitutional CID has and will continue to irreparably harm GDI. ................................................................................................................................ 16

STANDARD OF REVIEW ....................................................................................... 17

ARGUMENT .............................................................................................................. 18

    I.    GDI is likely to prevail on its First and Fourth Amendment claims because the Commission and Chairman Ferguson are clearly retaliating against GDI for its constitutionally protected activities. .................................................................................................... 18

    II.   Plaintiff GDI's constitutional right to research and report about the brand-damaging risks of disinformation has been and will continue to be chilled absent an injunction against the Commission's retaliatory CID. ............................................................................... 22

    III.  The remaining equitable factors weigh strongly in favor of granting GDI's request for preliminary injunction because the Commission and Chairman Ferguson are in no way harmed from being enjoined from enforcing an unconstitutional CID.................................................. 32

CONCLUSION............................................................................................................ 34

CERTIFICATE OF SERVICE ................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B.-B. v. Morgan*, 548 F. Supp. 3d 209 (D.D.C. 2020) ................................................ 17

*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987) .................................... 32

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016)......................................................... 19, 22

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)....................................................... 24

*Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2022) ........................................................ 25

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005) .......... 22

*Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013) ........................................................ 23

*Daily Wire, LLC v. Dep't of State*, No. 6:23-cv-609-JDK (E.D. Tex. Dec. 6, 2023) .................... 5

*Elrod v. Burns*, 427 U.S. 347 (1976)........................................................................... 22

*Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7 (D.D.C. 2020) ...................................... 17

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002)................................... 33

*Grajales v. P.R. Ports Auth.*, 682 F.3d 40 (1st Cir. 2012) ............................................. 25

*Hartley v. Wilfert*, 918 F. Supp. 2d 45 (D.D.C. 2013)................................................... 22

*Hartman v. Moore*, 547 U.S. 250 (2006) ...................................................................... 19

*Hawkins v. D.C.*, 923 F. Supp. 2d 128 (D.D.C. 2013) ................................................. 25

*Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115 (D.D.C. 2002) ...................... 20

*Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp 3d 76 (D.D.C. 2025)............... 22

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020)........................................................... 32

*Lewis v. Gov't of the Dist. of Columbia*, 161 F. Supp. 3d 15 (D.D.C. 2015) ............... 25

*Media Matters for Am. v. Bailey*, 2024 WL 3924573 (D.D.C. Aug. 23, 2024) ........... 25

*Media Matters for Am. v. FTC*, No. 1:25-cv-01959-SLS, 2025 WL 2988966 (D.C. Cir. filed Oct. 23, 2025) ........................................................... 1, 13, 19, 21, 22, 23, 26, 27, 28, 29, 30, 31, 33

*Media Matters for Am. v. FTC*, No. CV 25-1959 (SLS), 2025 WL 2378009 (D.D.C. Aug. 15, 2025) ........................................................... 2, 8, 14, 17, 19, 21, 22, 23, 24, 25, 26, 28, 31, 33

*Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025) ........................................ 19, 22

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) ............................................................. 20

*Nat'l Fed'n of the Blind v. FTC*, 420 F.3d 331 (4th Cir. 2005) .................................................. 18

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ........................................................ 22

*Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186 (1946) ...................................................... 20

*Pebble Ltd. P'ship v. Env't Prot. Agency*, 310 F.R.D. 575 (D. Alaska 2015) .............................. 20

*Perry v. Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2009) .................................................... 20

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500 (D.C. Cir. 2016) ...... 17, 22, 33

*Roth v. United States*, 354 U.S. 476 (1957) ................................................................. 20

*Snyder v. Phelps*, 562 U.S. 443 (2011) ..................................................................... 20

*Stanford v. Texas*, 379 U.S. 476 (1965) .................................................................... 20

*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000) ................................................................ 24

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) .............................................. 17

*Xiaomi Corp. v. Dep't of Def.*, No. 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021) ...... 22

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) ............................................................ 20

**Statutes**

15 U.S.C. § 44 ........................................................................................ 18

15 U.S.C. § 45 ........................................................................................ 18

Fed. R. Civ. P. 5(a) .................................................................................. 35

# INTRODUCTION

Plaintiff Disinformation Index, Inc. ("GDI") is the victim of a retaliatory campaign to punish it for constitutionally-protected reporting that Defendants dislike. This Court should enjoin the Federal Trade Commission ("FTC" or "Commission") from enforcing the modified civil investigative demand ("CID") issued to GDI in retaliation for GDI's protected speech in violation of the First and Fourth Amendments. The Court has already enjoined a similar CID that was issued to the advocacy group Media Matters because it was "a straightforward First Amendment violation." *See Media Matters for Am. v. FTC*, No. CV 25-1959 (SLS), 2025 WL 2378009 at *1 (D.D.C. Aug. 15, 2025); *see also Media Matters for Am. v. FTC*, No. 1:25-cv-01959-SLS, 2025 WL 2988966 at *6 (D.C. Cir. filed Oct. 23, 2025) (affirming the district court's preliminary injunction against the Commission's CID).

GDI is a non-partisan nonprofit that researches and educates the public about the prevalence and risks of online disinformation. Its research reports and digital resources equip buyers and sellers with the knowledge needed to make informed choices—an essential principle of a free-market economy and a free and open democracy. Relevant here, GDI publishes reports analyzing disinformation in U.S. online media and disseminates the Dynamic Exclusion List ("DEL"), a data report generated through GDI's proprietary algorithm identifying websites that are likely to mislead readers. GDI's reports highlight the risks of disinformation and brand-damaging extremism online, including websites that spread neo-Nazi ideology, antisemitic Russian propaganda, and anti-vaccine conspiracy theories.

As a nonprofit, GDI is outside of the FTC's jurisdiction and cannot be the target of an investigation. Nevertheless, the FTC has issued an exceptionally broad 29-specification CID requesting almost all of GDI's documents and code produced since its founding. GDI has been and

continues to be publicly targeted and harassed by Defendants Andrew Ferguson and the Commission for its constitutionally protected reporting—specifically, its U.S. media-market review and DEL. Months before his appointment as FTC Chair, Mr. Ferguson publicly attacked GDI on X, claiming that "the Global Disinformation Index and NewsGuard . . . led collusive ad boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States."[1] After becoming Chair, Mr. Ferguson escalated his campaign by issuing GDI the unconstitutional CID, purportedly to investigate "group boycotts in the advertising industry."[2]

GDI is not an advertiser or advertising agency, does not buy advertisements, and does not have any agreements with any company requiring them to buy (or not buy) ad placements or requiring them to pay (or not pay) for advertisements. GDI's subscribers and clients are free to make informed choices based on their own independent decisions.

The CID is causing GDI ongoing First and Fourth Amendment harm by seeking to compel it to disclose its most sensitive sources, methods, and internal research, including its proprietary algorithm, internal research, and external communications that were used in its DEL and research reports. None of the CID's requests calls for information that would uncover an advertiser or advertising agency boycott without infringing on GDI's constitutional rights. As a direct result of Chairman Ferguson's public harassment against GDI and retaliatory CID issued by the Commission, GDI suffers irreparable harm: suppression of its First Amendment protected speech, damage to its associations with funders, operational disruption, and economic loss.

---

[1] Andrew Ferguson (@AFergusonFTC), X (Nov. 12, 2024, 8:15 PM), https://x.com/AFergusonFTC/status/1856152760850243905.

[2] *Media Matters for Am.*, 2025 WL 2378009 at *21 (D.D.C.) (quoting Defs.' Opp'n at 28 (cleaned up).

GDI filed this case on November 25, 2025, seeking relief from the unconstitutional CID and the Commission's retaliation for GDI's constitutionally protected reporting. GDI now moves for a preliminary injunction against the Commission's unconstitutional CID and investigation. The Court should grant the motion.

## BACKGROUND

### A.    GDI is a nonprofit research organization that publishes reports on the risks of disinformation.

GDI is a nonpartisan, nonprofit media research organization that aims to educate the public, including advertisers, on the risk of disinformation in online news and the importance of information transparency. Compl. ¶ 42. Since its founding in 2018, GDI has compiled and published reports on disinformation all over the world to advertisers, the ad tech industry, social media platforms, policy makers, and the general public. Compl. ¶ 42. GDI distributed its research findings through the DEL and research reports. Compl. ¶ 48.

The DEL was a list of websites in 20 languages and 40 global media markets that were identified as having a high likelihood of disinformation based on GDI's proprietary algorithm. Compl. ¶ 49. GDI shared the DEL with its subscribers and clients who were free to use or ignore the information provided in the DEL however they saw fit on a case-by-case basis via their own independent decision-making. Compl. ¶ 11. GDI also published bespoke research reports to policy makers in governments, regulatory bodies, platforms around the world, and to the general public per its mission. Compl. ¶ 50. Of these reports, GDI's media market reviews presented GDI's research on disinformation in online news sources around the world, including Senegal, Thailand, and Germany. Compl. ¶ 47.

Of the approximately 40 media market reviews on disinformation risks in various countries, GDI published only one report on the digital media market in the United States in

December 2022. Compl. ¶ 50; Exhibit A to Declaration of Joseph A. Ostoyich, Dec. 2022 U.S. Media Market Review. The report reviewed 69 online news sources and analyzed the likelihood each news source had of disinforming its readers. Compl. ¶ 60. The report then ranked, of the 69 sampled, the ten news sources with the highest likelihood of disinformation and the ten news sources with the lowest likelihood of disinformation. Compl. ¶ 60. A number of the news sources listed as having a higher likelihood of disinformation, including The Daily Wire and The Federalist, responded by launching a harassment campaign against GDI, of which the Trump Administration and its allies quickly joined. Compl. ¶¶ 66–69.

**B.** **GDI has been attacked by the Trump Administration and its allies for GDI's First Amendment protected speech.**

In retaliation to GDI's First Amendment protected reporting activities, the Trump Administration and its allies have concocted a coordinated harassment campaign to punish GDI under the false position that GDI "aid[ed] the Biden administration's efforts to blacklist and block conservative media companies" by "feed[ing] blacklists to ad companies with the intent of defunding and shutting down websites peddling alleged 'disinformation.'"[3] Compl. ¶ 56. This erroneous assertion has fueled a federal lawsuit, a House Interim Staff Report, and an onslaught of harassing statements on social media by current and former Trump Administration officials, including Elon Musk, Marco Rubio, Brendan Carr, Matt Gaetz, Mike Benz, and Andrew Ferguson. Compl. ¶¶ 1, 3–4, 66, 78–84, 94–96, 106.

---

[3] *CRA Budget in Focus: Department of State and Foreign Aid*, Ctr. for Renewing Am. (Apr. 11, 2023), https://americarenewing.com/issues/cra-budget-in-focus-department-of-state-and-foreign-aid/ (internal citations omitted); *see also State Department-Backed Group to Stop Funding 'Disinformation' Index that Targeted Right-Leaning Sites*, Fox News (Feb. 21, 2023), https://www.foxnews.com/media/state-department-backed-group-stop-funding-disinformation-index-targeted-right-leaning-sites.

In December 2023, The Daily Wire, The Federalist, and the State of Texas sued the State Department asserting that its Global Engagement Center ("GEC") funded GDI "to censor the American press." *Daily Wire, LLC v. Dep't of State*, No. 6:23-cv-609-JDK (E.D. Tex. Dec. 6, 2023); Compl. ¶ 67. The plaintiffs issued a nonparty subpoena to GDI, which the court found was "facially overbroad and disproportionate to the needs of the case." Compl. ¶ 70. Despite GDI's compliance with the litigation and informing that it only received funding for research activities outside of the United States and to add non-European language capabilities like Chinese and Russian to its proprietary algorithm, the Trump Administration and its allies continued to harass GDI. Compl. ¶ 53.

Weeks before the FTC issued this CID to GDI, Secretary of State Marco Rubio joined the harassment campaign and published an article on The Federalist stating his intention to abolish the GEC, which Rubio asserted was "a dark chapter in America's constitutional history: the weaponization of America's own government to silence, censor, and suppress the free speech of ordinary Americans."[4] Compl. ¶¶ 72–73. Rubio wrote, "My choice to publish this piece in The Federalist is no coincidence. One recipient of your taxpayer dollars was a British entity called the Global Disinformation Index (GDI). GDI once produced a list of the top 10 'riskiest online news outlets' in a direct bid to drive off their ad revenue and put them out of business. Every one of those 10 sites was on the political right, and The Federalist was among them."[5] Compl. ¶ 73.

Trump congressional allies, Matt Gaetz and Jim Jordan, have also added to the anti-GDI harassment campaign. Former Republican Congressman Matt Gaetz reposted a series on

---

[4] Marco Rubio, *Rubio: To Protect Free Speech, The Censorship-Industrial Complex Must Be Dismantled*, THE FEDERALIST (Apr. 16, 2025), https://thefederalist.com/2025/04/16/rubio-to-protect-free-speech-the-censorship-industrial-complex-must-be-dismantled/.
[5] *Id.*

X that called GDI a "conservative blacklist," and commented "Very Important."[6] Compl. ¶ 80. Gaetz, along with Congressman Jim Jordan (R-OH), publicly "vow[ed] to investigate the State Department for bankrolling a 'disinformation' tracking group that is, as the Washington Examiner revealed, secretly blacklisting and taking steps to defund conservative media outlets."[7] Compl. ¶ 81.

Mike Benz, former Trump Administration State Department Official and Director of the Foundation for Freedom Online, posted a series of posts on X asserting that GDI is a "mercenary censorship organization,"[8] is part of the "censorship industry,"[9] and implied that GDI is part of a CIA plot.[10] Compl. ¶ 94.

Elon Musk, former special Government employee to the Trump Administration and the single-most significant donor to Trump's 2024 Presidential campaign, reposted a video on X by

---

[6] Matt Gaetz (@MattGaetz), X (Feb. 10, 2023, 4:05 PM), https://x.com/mattgaetz/status/1624152499153141760.

[7] Gabe Kaminsky, *Disinformation Inc: Jim Jordan and Matt Gaetz Vow Investigation into Conservative Site Blacklists*, WASH. EXAM'R (Feb. 16, 2023), https://www.washingtonexaminer.com/news/1853747/disinformation-inc-jim-jordan-and-matt-gaetz-vow-investigation-into-conservative-site-blacklists/.

[8] Mike Benz (@MikeBenzCyber), X (Apr. 18, 2024, 10:36 AM), https://x.com/MikeBenzCyber/status/1780958657729253674.

[9] Mike Benz (@MikeBenzCyber) Mike Benz, X, (Aug. 21, 2023, 11:36 AM), https://x.com/MikeBenzCyber/status/1693663142746996756.

[10] *See* Mike Benz (@MikeBenzCyber), X (Aug. 21, 2023, 9:56 AM) https://x.com/MikeBenzCyber/status/1693662849401598381 (stating that "GDI is part of a vast new class of 'middleware' orgs staffed by spooks & CIA creeps to Kill Your Media Company); *see also* Mike Benz (@MikeBenzCyber), X (Mar. 2, 2023, 12:35 PM), https://x.com/MikeBenzCyber/status/1631347477465948174 (stating "GDI is just one of a tiny handful of dozens (hundreds, actually, if you include State Dept, CIA and USAID) of similarly situated government-backed censorship orgs").

UnHerd stating "how [GDI] censors political speech across Europe and the US."[11] Compl. ¶ 83.

Musk added his own assertion that "***GDI pushes disinformation and should be shut down, with recriminations [sic] for the miscreants***."[12] Compl. ¶ 84.



[11] Freddie Sayers (@freddiesayers), X (Apr. 17, 2024, 9:24 AM), https://x.com/freddiesayers/status/1780588224261317108?s=46&t=2yQS3wsEbvI9bCYB3nT64Q.

[12] Elon Musk (@elonmusk), X (Apr. 18, 2024, 6:58 PM), https://x.com/elonmusk/status/1781094892866781255?s=46&t=2yQS3wsEbvI9bCYB3nT64Q.

In September 2024, the House Committee on Small Business, which is led by Chairman Roger Williams (R-TX), published a House Interim Staff Report titled, "Small Business: Instruments and Casualties of the Censorship-Industrial Complex" that dedicated an entire section to GDI. Compl. ¶85. The House Interim Staff Report asserted that GDI's DEL "is essentially a blacklist."[13] *Id.*

In November 2024, Chair of the Federal Communications Commission, Brendan Carr, made a series of posts on X about dismantling the "censorship cartel"[14] and how the "censorship cartel must be dismantled and destroyed. Now."[15] Compl. ¶ 98.

### C. Defendants Ferguson and the Commission joined the anti-GDI harassment campaign.

Prior to chairing the Commission, then-Commissioner Ferguson proclaimed that he had a "track record of standing up to . . . the radical left" and would "[i]nvestigate . . . advertiser boycotts."[16] *Media Matters for Am.*, 2025 WL 2378009 at *19 (D.D.C.); Compl. ¶ 90. In an interview with Mike Benz—an outspoken critic of GDI—Ferguson stated that "antitrust laws may

---

[13] *Small Business: Instruments and Casualties of the Censorship-Industrial Complex*, U.S. HOUSE COMM. ON SMALL BUS., Interim Staff Report 2024 at 29, https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_cic_report_september_2024.pdf.

[14] Brendan Carr (@BrendanCarrFCC), X (Nov. 14, 2024, 7:19PM), https://x.com/BrendanCarrFCC/status/1857216731590148365.

[15] *Id.*; *see also* Brendan Carr (@BrendanCarrFCC), X (Nov. 15, 2024, 8:45 AM), https://x.com/BrendanCarrFCC/status/1857419658812440927 ("The censorship cartel must be dismantled."); Brendan Carr (@BrendanCarrFCC), X (Nov. 17, 2024, 8:54 PM), https://x.com/BrendanCarrFCC/status/1858327922810970327 ("We must dismantle the censorship cartel and restore free speech rights for everyday Americans.").

[16] *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, PUNCHBOWL NEWS, https://punchbowl.news/wp-content/uploads/FTC-Commissioner-Andrew-N-Ferguson-Overview.pdf.

have something to say about what's been going on [with] . . . advertiser boycotts."[17] Compl. ¶ 96. In another interview on Steve Bannon's WarRoom podcast, Ferguson reaffirmed that it is "really important that the FTC take investigative steps in the new administration under President Trump" because "progressives, Silicon Valley, [and] everyone who is fighting 'disinformation' is not going to give up just because of the election."[18] Compl. ¶ 97. He further asserted that "[t]here is another danger to free speech on Big Tech platforms that may fall within our antitrust bailiwick: advertiser boycotts" and that the Commission "ought to conduct such an investigation."[19] Compl. ¶ 99.

In November 2024, Ferguson posted on X that "the Global Disinformation Index and NewsGuard . . . led collusive ad boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States."[20] Compl. ¶ 95.

---

[17] Mike Benz (@MikeBenzCyber), X (Nov. 24, 2024, 6:59 PM), https://x.com/mikebenzcyber/status/1860835679560765841?s=46&t=2yQS3wsEbvI9bCYB3nT64Q.

[18] *Bannon's WarRoom, Show Clip Roundup 11/30/2024 [AM]*, WARROOM (Nov. 30, 2024), https://warroom.org/bannons-warroom-show-clip-roundup-11-30-2024-am/.

[19] Concurring Statement of Commissioner Andrew N. Ferguson, *FTC v. 1661, Inc. d/b/a GOAT*, Matter Number 2223016, Fed. Trade Comm'n (Dec. 2, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-goat-concurrence.pdf.

[20] Andrew Ferguson (@AFergusonFTC), X (Nov. 12, 2024, 8:15 PM), https://x.com/AFergusonFTC/status/1856152760850243905.



**Andrew Ferguson** ✓
@AFergusonFTC

Big win for free speech. One of the major organs of the censorship industrial complex goes down.

No government agency should be in the business of policing speech. Nebulous terms like "misinformation," "disinformation," and "malinformation," really mean any speech which goes against the elite consensus in DC and Silicon Valley.

In 2022, the FTC issued a report that praised the Global Engagement Center for "defend[ing] against foreign disinformation and propaganda," and suggested the GEC was best "positioned to advise Congress" on how to counter disinformation. But Congressional investigations revealed the GEC funded the Global Disinformation Index and NewsGuard, which led collusive ad-boycotts— possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States.

**Mike Benz** ✓ @MikeBenzCyber · 11 Nov 24
Oh no anything but that

≡  **WSJ**

| SUBSCRIBE | SIGN IN |

**Censors Domestic Citizens**
NATIONAL SECURITY

# State Department Division That ~~Battles~~ ~~Foreign Disinformation~~ Faces Closure

The Global Engagement Center, which has been criticized by Elon Musk, may be shut down as Trump prepares to take power

By *Michael R. Gordon* [Follow] and *Dustin Volz*
[Follow]
*Nov. 10, 2024 at 10:00 am ET*

8:51 PM · 11 Nov 24 · **572K** Views

10

In December 2024, Ferguson posted on X that "[t]he FTC must protect Americans' freedom of speech online. If platforms or advertisers are colluding to suppress free speech in violation of the antitrust laws, the FTC must prosecute them and break up those cartels."[21] Compl. ¶ 100. One week later, President Trump announced Ferguson's appointment to Chairman on Truth Social, stating that "Andrew has a proven record of standing up to Big Tech censorship, and protecting Freedom of Speech in our Great Country. . . . he will be able to fight on behalf of the American People on Day One of my Administration."[22] Compl. ¶¶ 101–2.

Shortly after becoming Chairman, Ferguson reiterated that the "risk [of advertiser boycotts] is real and needs to be confronted and taken seriously."[23] Compl. ¶ 107. Chairman Ferguson followed through on these threats by issuing GDI a sweeping CID in retaliation to its First Amendment protected research reporting. Compl. ¶ 108.

### D. Defendants Ferguson and the Commission ramped up the anti-GDI harassment campaign by launching a retaliatory investigation into GDI's media reporting activities.

On May 20, 2025, the Commission issued an extremely broad CID to GDI that originally lacked a subject of the investigation—it simply stated, "See attached." Compl. ¶¶ 111–12. The attachment was a resolution issued by a previous Commission from 2022 that broadly authorized it to launch investigations about "facilitating collusion or coordination in any way with any other market participant." Compl. ¶ 112; Exhibit B to Declaration of Joseph A. Ostoyich, FTC CID at

---

[21] Andrew Ferguson (@AFergusonFTC), X (Dec. 3, 2024, 8:38 AM), https://x.com/afergusonftc/status/1863940797751599579?s=46&t=2yQS3wsEbvI9bCYB3nT64 Q.

[22] Donald Trump (@realDonaldTrump), Truth Social (Dec. 10, 2024, 5:58 PM), https://truthsocial.com/@realDonaldTrump/posts/113631003888738065.

[23] *Transcript: FTC Chairman Andrew Ferguson Keynote*, PROMARKET (Apr. 17, 2025), https://www.promarket.org/2025/04/17/transcript-ftc-chair-andrew-ferguson-keynote/.

21. The attachment did not include any mention of the advertising industry or how GDI was in any way related to the investigation. Compl. ¶ 112. Even after the Commission modified GDI's CID to include a subject of the investigation, the purpose of the Commission's investigation was still vague. Compl. ¶ 113. Based on the Commission's statements in Opposition papers in the *Media Matters* litigation, it appears that the Commission intends to investigate "whether online advertisers and/or advertising agencies have unlawfully agreed to use certain lists promulgated by other industry participants that categorize or rate content publishers as not 'brand suitable' or not 'brand safe,' to coordinate the placement of ads." Compl. ¶ 114.

Based on Chairman Ferguson's post on X, these alleged advertiser and advertising agency boycotts "censor the speech of conservative and independent media in the United States"[24]— conservative and independent media such as websites that publish and promote:

- "The American Nazi Party . . . Are you tired of being blamed for all the world's problems simply because you are White?"[25]

- Antisemitic propaganda claiming that Russian pogroms are make-believe: "Yet Another 6 Million: The Fable of Pogroms Against Jews in Tsarist Russia;"[26]

- Anti-vax conspiracies claiming the U.S. government—"The Hierarchy Enslaving You"—is engaged in efforts to "put smart gadget implants into human bodies" in order to begin "controlling our every aspect" through "brain microchips;"[27]

---

[24] Andrew Ferguson (@AFergusonFTC), X (Nov. 12, 2024, 8:15 PM), https://x.com/AFergusonFTC/status/1856152760850243905.

[25] AMERICAN NAZI PARTY, www.americannaziparty.com (last visited Nov. 24, 2025).

[26] *Yet Another Six Million: The Fable of Pogroms Against Jews in Tsarist Rusia*, RUSSIA INSIDER (Feb. 14, 2019), https://russia-insider.com/en/history/yet-another-six-million-fable-pogroms-against-jews-tsarist-russia/ri25143.

[27] *6 Ways to Protect Yourself from Unprecedented 6G Health Threats*, ACTIVIST POST (Aug. 19, 2025), https://www.activistpost.com/6-ways-to-protect-yourself-from-unprecedented-6g-health-threats/.

- Left-leaning sites posting theories claiming "86% of PCR-Positive 'Covid Cases' Were Not Real Infections" and that "The PCR 'Test' Cannot Detect the Identity of the Virus;"[28]

- Conspiracy theories claiming "that the ruling elitists are using mail-order nasal [flu] 'vaccines'" to "depopulate humanity to create a larger artificial intelligence infrastructure" by "freeing up electricity and water."[29]

Compl. ¶¶ 16–20.

The Commission has reportedly issued at least 17 CIDs to carry out its investigation into this supposed advertiser boycott, including one to GDI. *Media Matters for Am.*, 2025 WL 2988966 at \*9 (D.C. Cir.). GDI is a nonprofit media research organization that researches, compiles data, and creates reports on the risks of disinformation online—disinformation like that from the American Nazi Party, antisemitic Russian propaganda, microchip implanting and nasal flu vaccine conspiracy theorists, above. Compl. ¶¶ 16–20, 42. GDI is not an advertiser or advertising agency, does not buy advertisements, and does not have any agreements with any company requiring them to buy (or not buy) ad placements or requiring them to pay (or not pay) for advertisements. Compl. ¶ 116. Whatever decisions advertisers or advertising agencies made regarding the placement of ads or ad spend was done entirely with their own independent decision-making. *Id.*

Regardless of the Commission's broadly stated investigation, GDI is a nonprofit

---

[28] *BREAKING: Peer Reviewed Report. 86% of PCR-Positive "COVID Cases" Were Not Real Infections*, GLOB. RSCH. (Nov. 9, 2025), https://www.globalresearch.ca/breaking-86-pcr-positive-covid-cases-not-real-infections/5905098.

[29] *Whistleblowers Claim There's a "Plan" to Depopulate Humanity for a Larger AI Infrastructure*, WASH. STANDARD (Aug. 21, 2025), https://thewashingtonstandard.com/whistleblowers-claim-theres-a-plan-to-depopulate-humanity-for-a-larger-ai-infrastructure/.

organization outside the scope of the Commission's enforcement authority. Compl. ¶ 26. Despite the Commission lacking jurisdiction over GDI, the Commission's CID as modified expansively calls for 29 different requests for documents, information, and data on GDI's finances, external communications, internal research, and underlying methodology for its proprietary algorithm. Compl. ¶¶ 117–18, 143. The CID requires GDI to produce this information from January 1, 2018 to the present, which is one year longer than Media Matters' CID that the D.C. District Court characterized as "sweeping." Compl. ¶ 181; *see also Media Matters for Am.*, 2025 WL 2378009 at *1 (D.D.C.) (explaining that the Commission also "issued a sweeping CID to Media Matters, purportedly to investigate an advertiser boycott concerning social media platforms"). The CID as modified requires GDI to produce an extensive set of documents,[30] including the following:

- "all documents relating to ratings of any media, or any other product, program, project, work, or special report relating to data, analysis, or journalism that helps companies or consumers identify reliable information or disinformation or distinguish between sources of information online."

- "all communications between GDI and any other party regarding any request for GDI to label any content as disinformation, false, misleading, or deceptive."

- "all documents relating to any complaints that GDI received related to its activities, programs, or policies, including but not limited to its decisions on whether to label any content as disinformation, false, misleading, or deceptive."

---

[30] The CID includes at least 11 specifications that require GDI to produce "all documents" related to the requested information. The Commission's definition of "documents" is so broad and extensive that compliance with these requests would be nearly impossible. The Commission's definition of "documents" in the CID "includes, without limitation: computer files; email messages; text messages; instant messages and chat logs; other Messaging Applications; group chats; voicemails and other audio files; calendar entries; schedulers; drafts of documents; metadata and other bibliographic or historical data describing or relating to documents created, revised, or distributed electronically; copies of documents that are not identical duplicates of the originals in that Person's files; notes of meetings or telephone calls; and copies of documents the originals of which are not in the possession, custody, or control of GDI." Exhibit C to Declaration of Joseph A. Ostoyich ("Ex. C"), Modified CID at 10.

- "all communications between GDI and any advertiser, advertising agency, or any person acting as an agent of an advertiser, including but not limited to demand side platforms and supply side platforms, related to brand safety and/or any of the GDI products and services[.]"

- "all documents relating to other entities that purport to track, categorize, evaluate, or rate news sources, outlets, websites, content, or other entities for 'misinformation,' 'hate speech,' 'false' or 'deceptive' content, or similar categories, including but not limited to communications between GDI, or any of GDI's clients, and any person connected to those entities[.]"

- "all documents reflecting allegations that GDI's reliability, credibility, safety, or other similar ratings are or may be politically biased."

- "all documents reflecting allegations that GDI's reliability, credibility, safety, or other similar ratings (or the criteria upon which they are based) are or may be unreliable, subjective, unscientific, or otherwise methodologically unsound."

- "all documents relating to all analyses, evaluations, and assessments performed by or provided to GDI of the effect of any rating, label, or categorization maintained by GDI, on the profits, revenues, unique visitors, subscribers, or any other business metric of any news source, news outlet, news website, or other news content publisher rated, evaluated, assigned a label, or otherwise scored by GDI, and all data sets and code that would be necessary to replicate the analysis."

- "all documents relating to any benefits to advertisers, brands, or advertising agencies that result from using any product or service[.]"

- "all documents relating to the purpose of any rating, label, or categorization maintained by GDI, including but not limited to promotional and advertising materials created or disseminated by GDI."

- "all documents relating to GDI's use of AI technology to provide any of its services."

- "all documents relating to GDI working with ad tech, technology, or developer companies to develop and advance GDI's programs, policies, and objectives, including but not limited to any agreements between GDI and these companies."

- "all analyses or studies GDI conducted, sponsored, or commissioned relating to advertising on social media or digital advertising platforms, and all data sets and code that would be necessary to replicate the analysis."

These requests illustrate that the true purpose of the Commission's investigation is not to uncover

an illegal advertising boycott but to retaliate and punish GDI for its media reporting activities that

Chairman Ferguson and the Commission do not agree with. For example, the CID demands "all documents reflecting allegations that ***GDI's reliability, credibility, safety, or other similar ratings are or may be politically biased***." Also, for example, the CID demands "all documents reflecting allegations that GDI's reliability, credibility, safety, or other similar ratings (or the criteria upon which they are based) are ***or may be unreliable, subjective, unscientific, or otherwise methodologically unsound***." Ex. C, Modified CID at 3. These requests do not aid the Commission's purported investigation to root out an advertiser boycott. Instead, they seek to gain further ammunition for Chairman Ferguson and the Commission to use in the harassment campaign against GDI.

Chairman Ferguson maintained his position shortly after issuing GDI's CID and asserted that the "the supreme evil of antitrust" is "collusion with other firms and the creation of pre-made 'exclusion lists' to encourage advertisers to join de facto boycotts coordinated by advertising firms and other third parties" and that "investigating and policing censorship practices that run afoul of the antitrust laws is a top priority of the Trump-Vance FTC."[31] Compl. ¶ 108.

### E. The Commission's unconstitutional CID has and will continue to irreparably harm GDI.

GDI has suffered irreparable harm since the Commission issued the CID through a chilling effect on its speech—GDI has completely paused its nonprofit operations in the United States. Dr. Daniel Rogers Declaration at ¶ 30 ("Rogers Decl."). The CID has discouraged GDI from publishing additional research and commentary on disinformation risks in the United States. Rogers Decl. at ¶ 24. For example, GDI would have continued to publish research on Russian

---

[31] Statement of Chairman Andrew N. Ferguson, *In the Matter of Omnicom Group / The Interpublic Group of Cos.*, Matter Number 2510049, Fed. Trade Comm'n (June 23, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/omnicom-ipg-ferguson-statement_0.pdf.

interference in the United States but for the Commission's CID. Rogers Decl. at ¶ 25. In addition to the Commission's CID curtailing GDI's research and reporting, funders and partners have stopped associating with GDI as they now fear their information will no longer be kept confidential because of the Commission's investigation. Rogers Decl. at ¶¶ 26–27. The harassment campaign against GDI has even escalated to the point where the organization has received death threats, prompting some staff members to resign out of concern for their safety. Rogers Decl. at ¶¶ 32–37.

The CID's breadth and intrusiveness are practically identical to those called for in Media Matters' CID, which this Court has already determined would chill any media company. *Media Matters for Am.*, 2025 WL 2378009 at *18 (D.D.C.) (emphasizing that "[i]t is hard to imagine any media company not being chilled by this sweeping and sensitive CID"); Compl. ¶ 144. Further, the Commission does not have enforcement authority over GDI as it is a nonprofit. Compl. ¶ 26. Despite this, the Commission has used this CID to chill GDI's media reporting activities. Compl. ¶ 146.

## STANDARD OF REVIEW

A plaintiff seeking preliminary relief must show: (1) likelihood of success on the merits; (2) likelihood of "suffer[ing] irreparable harm in the absence of preliminary relief;" (3) that "the balance of equities tips in [their] favor;" and (4) that "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors "merge when plaintiff attempts to preliminarily enjoin a government action," *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020), "because the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). And a plaintiff "need only establish a likelihood of success on the merits of one claim to obtain . . . injunctive relief." *Media*

*Matters for Am.*, 2025 WL 2378009 at *7 (D.D.C.) (quoting *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 218 (D.D.C. 2020)).

## ARGUMENT

**I.**  **GDI is likely to prevail on its First and Fourth Amendment claims because the Commission and Chairman Ferguson are clearly retaliating against GDI for its constitutionally protected activities.**

The Commission's CID is clearly retaliatory because GDI is a nonprofit organization and is outside the Commission's jurisdiction. *See* 15 U.S.C. §§ 44-45 (limiting the Commission's jurisdiction to entities "organized to carry on business for [their] own profit or that of [their] members"); *see also Nat'l Fed'n of the Blind v. FTC*, 420 F.3d 331, 334 (4th Cir. 2005) (holding that nonprofits "fall outside the scope of the agency's jurisdiction"); Exhibit D to Declaration of Joseph A. Ostoyich, GDI's Pet. to Quash FTC CID at 7–8. This sweeping, untailored CID is facially disproportionate to GDI's non-party status. As a non-party to the Commission's investigation into "whether online advertisers and/or advertising agencies have unlawfully agreed to use certain lists promulgated by other industry participants," GDI is being harassed by Chairman Ferguson and the Commission because GDI is a media reporting organization with a mission of educating the public about disinformation and creating internet transparency—not an advertiser or advertising agency. The Court does not need to hunt for the pretext here: Chairman Ferguson and other Trump administration officials have been expressly stating for over a year that they do not agree with and do not like GDI's protected speech.

GDI has never required any advertiser or advertising agency to buy (or not buy) advertisements or do business (or not do business) with any particular website or publisher. Compl. ¶ 116. Not one request in the Commission's CID calls for information that would uncover an advertiser or advertising agency boycott without infringing GDI's constitutionally protected speech. Compl. ¶ 119. Further, the Commission has failed to explain why non-party GDI has

information that it could not receive directly from the advertisers or advertising agencies the Commission is targeting without burdening GDI with a CID that broadly infringes on its First and Fourth Amendment rights. Compl. ¶ 115.

"[T]he law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To prevail on its retaliation claim, Plaintiff must show that "(1) [it] engaged in conduct protected under the First Amendment; (2) [the Commission] took some retaliatory action sufficient to deter a person of ordinary firmness in [Plaintiff's] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

Plaintiff's motion for a preliminary injunction is governed by the decision in *Media Matters*—which relied on the same caselaw to enjoin the Commission from enforcing, essentially, the same CID because Media Matters was likely to succeed on the merits. *See Media Matters for Am.*, 2025 WL 2378009 at *7 (D.D.C.) (finding "that Media Matters is likely to succeed on the merits of its First Amendment retaliation claim"); *see also Media Matters for Am.*, 2025 WL 2988966 at *6 (D.C. Cir.) (affirming the district court "finding a likelihood of retaliation at this preliminary stage"). The Court should, thus, find in favor of GDI, too.

In *Media Matters*, this Court determined that "Media Matters engaged in protected activities under the First Amendment" when it published an article stating "that as a result of Elon Musk's acquisition of Twitter (now 'X'), advertisements on the social media platform were appearing next to antisemitic posts and other offensive content." *Media Matters for Am.*, 2025 WL 2378009 at *1, 15 (D.D.C.); *see also Media Matters for Am.*, 2025 WL 2988966 at *6 (D.C. Cir.)

(finding that Media Matters "engaged in First Amendment protected speech when it published its November 2023 article about the inclusion of antisemitic and hateful material on X").

This Court should similarly find that GDI's media market reports and its DEL are "quintessential First Amendment activities." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025). GDI conducted independent risk assessments of media sites and shared the results of those assessments through its media market reports and its DEL. Compl. ¶¶ 11, 42. GDI's researching and reporting through its media market reports and DEL on matters of public concern—the risks of disinformation in online news—lies at the heart of the First Amendment's protections. *See Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.") (cleaned up); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions."); *Roth v. United States*, 354 U.S. 476, 484 (1957) ("The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.").

The First and Fourth Amendments both constrain the government's ability to compel disclosure through administrative subpoenas such as CIDs, particularly where expressive or associational rights are implicated. The First Amendment provides a privilege against compelled disclosure of materials that would chill protected expression, especially in the context of newsgathering and editorial decision-making. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009); *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 118 (D.D.C. 2002). The Fourth Amendment requires that such demands be reasonable in scope, purpose, and relevance and be "carefully tailored to avoid unnecessary interference with protected activities." *Pebble Ltd.*

*P'ship v. Env't Prot. Agency*, 310 F.R.D. 575, 582 (D. Alaska 2015); *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Where these constitutional protections intersect, courts apply the Fourth Amendment's requirements with "scrupulous exactitude" if the materials sought "may be protected by the First Amendment." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).

This Court has already found that a similar CID, with the same FTC matter number as GDI's CID, was "sweeping" and unconstitutional. Compl. ¶ 181; *see Media Matters for Am.*, 2025 WL 2378009 at *1 (D.D.C.) (explaining that the Commission also "issued a sweeping CID to Media Matters, purportedly to investigate an advertiser boycott concerning social media platforms"); *see also Media Matters for Am.*, 2025 WL 2988966 at *2 (D.C. Cir.) (finding that "the Commission issued a sweeping sixteen-page civil investigative demand to Media Matters"). The D.C. Circuit has also found that Media Matters' similar CID "on its face, appears to require Media Matters to disclose information that may implicate the First Amendment reporter's privilege." *Media Matters for Am.*, 2025 WL 2988966, at *10 (D.C. Cir.).

This Court should also find that the Commission's CID to GDI is sweeping and requests information that is protected by the First Amendment. The Commission does not have jurisdiction over GDI as a nonprofit organization. As such, GDI is a non-party to the Commission's investigation into advertisers and/or advertising agencies. It therefore is particularly invasive and not "carefully tailored to avoid unnecessary interference" with GDI's protected activities to issue a 29-request CID going back 7 years that is entirely about GDI's protected activities. Not one of those 29 requests calls for information about any agreements among advertisers or advertising agencies. Compl. ¶¶ 115–26. The Commission should gather information on agreements between advertisers or advertising agencies from those parties directly, instead of burdening nonparty

GDI—a nonprofit organization outside the Commission's jurisdiction—with a sweeping CID that infringes upon GDI's constitutionally protected activities. Compl. ¶¶ 115, 145.

## II. Plaintiff GDI's constitutional right to research and report about the brand-damaging risks of disinformation has been and will continue to be chilled absent an injunction against the Commission's retaliatory CID.

This Court has already determined that "'[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.'" *Media Matters for Am.*, 2025 WL 2378009 at *22 (D.D.C.) (quoting *Paxton*, 138 F.4th at 585 (quoting *Pursuing Am.'s Greatness*, 831 F.3d at 511)); *see also Media Matters for Am.*, 2025 WL 2988966 at *10 (D.C. Cir.) (quoting same) (and quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Furthermore, courts have found that "self-censorship," "retaliation," and "harm to reputation or goodwill" are all irreparable injuries which warrant injunctive relief. *Paxton*, 138 F.4th at 563; *Xiaomi Corp. v. Dep't of Def.*, No. 21-280 (RC), 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (cleaned up).

Government efforts to suppress disfavored speech, whether direct or indirect, are constitutionally impermissible. As the Supreme Court recently reaffirmed, officials "cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024). A First Amendment retaliation claim does not require proof of overt censorship; it is enough to show that the government's conduct would deter a person of ordinary firmness from continuing to speak. *Aref*, 833 F.3d at 258. This is not a high bar. *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp 3d 76, 95 n.7 (D.D.C. 2025). Plaintiffs need not demonstrate that the challenged conduct completely silenced their speech; rather, it is sufficient to show that the government's actions would chill protected expression among similarly situated speakers. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). Indeed, the plaintiff's actual response to

the challenged conduct may itself serve as evidence of its chilling effect. *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013) (quoting *Constantine*, 411 F.3d at 500).

In *Media Matters*, this Court has already determined that "[t]here can be no doubt that such a CID would deter a reporter of ordinary firmness from speaking again." *Media Matters for Am.*, 2025 WL 2378009 at *2 (D.D.C.); *see also Media Matters for Am.*, 2025 WL 2988966 at *6 (D.C. Cir.) (maintaining that "the district court's preliminary factual findings that the Commission's sweeping Demand has deterred third parties from talking or associating with Media Matters in a manner that materially impedes its communicative work and would deter a person of ordinary firmness from undertaking similarly critical speech again").

Here, this Court should find—even more so than in *Media Matters*—that the Commission's CID to GDI would deter a person of ordinary firmness in GDI's position from speaking again. The Commission issued an exceptionally overbroad CID to GDI, which includes 29 requests calling for records relating to all aspects of its media reporting operations throughout its existence. GDI's CID includes **nine more** requests than the CID in *Media Matters*. Compl. ¶ 144. The Commission's CID to GDI further requires GDI to produce information over a longer period than the Media Matters CID—GDI's CID requests information from January 1, 2018 to the present, which is **one year longer** than the Media Matters CID. Compl. ¶ 118. Further, the Commission's CID requires GDI to produce every piece of code GDI has ever written, which is a massive amount of data that is all protected under the First Amendment. *See* Ex. C, Modified CID at 4 (requesting "all documents relating to all analyses, evaluations, and assessments performed by or provided to GDI of the effect of any rating, label, or categorization maintained by GDI, on the profits, revenues, unique visitors, subscribers, or any other business metric of any news source, news outlet, news

website, or other news content publisher rated, evaluated, assigned a label, or otherwise scored by GDI, and all data sets and code that would be necessary to replicate the analysis").

Courts have repeatedly recognized that the initiation of an investigation can chill speech. In *Cooksey v. Futrell*, 721 F.3d 226, 237 (4th Cir. 2013), the Fourth Circuit held that a state agency's notice of investigation and assertion of regulatory authority over a website's content was sufficient to deter speech. Similarly, in *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000), the Ninth Circuit found that a retaliatory investigation "unquestionably chilled the plaintiffs' exercise of their First Amendment rights," even though the government never pursued formal enforcement. This is true even when the government "threat[ens] invoking legal sanctions and other means of coercion, persuasion, and intimidation." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).

In *Media Matters*, this Court determined that Media Matters' speech was likely chilled by the CID when it refrained from reporting on matters that it "would have pursued but for the FTC CID." *Media Matters for Am.*, 2025 WL 2378009 at *16 (D.D.C.). For example, Media Matters declared that "because of the FTC CID, we have refrained from reporting on the FTC's relationship with right-wing media or Musk's relationship with the FTC." *Id.* The Commission's CID has chilled GDI's speech in the exact same way. And, thus, this Court should grant Plaintiff's motion for a preliminary injunction for the same reason.

This Court should find—as it did in *Media Matters*—that the requirement to demonstrate irreparable harm "is easily met" here. *Media Matters for Am.*, 2025 WL 2378009 at *22 (D.D.C.). GDI has completely paused its nonprofit operations in the United States. Rogers Decl. at ¶ 30. GDI has suffered ongoing irreparable harm to its constitutionally protected reporting. Rogers Decl. at ¶ 24. Specifically, the CID has deterred GDI from publishing research and reports on disinformation risks in the face of the broader retaliation campaign that has been mounted against it. *Id.* For

example, GDI would have continued to research and report on Russian disinformation in the United States absent the Commission's CID. Rogers Decl. at ¶ 25. Chairman Ferguson's decision to involve the Commission in this retaliation campaign has only intensified the pressure on GDI to cease its protected speech. Rogers Decl. at ¶ 20. Funders and partners have ceased associating with GDI out of fear of the Commission's investigation, making it harder for GDI to conduct internal research for its reporting activities. Rogers Decl. at ¶¶ 26–27. GDI has even received death threats for its protected conduct and members of its staff have left their positions out of fear for their safety. Rogers Decl. at ¶¶ 32–37.

The Commission's CID is clearly linked to GDI's constitutionally protected activities. Courts assess causation by assessing (1) "whether [the] speech was a substantial or motivating factor in prompting the retaliatory or punitive act" and (2) if the government can show "that it would have reached the same decision in the absence of the protected speech." *Hawkins v. D.C.*, 923 F. Supp. 2d 128, 137 (D.D.C. 2013). Evidence sufficient to show causation can take many forms because direct evidence is "rarely available" to prove something so "protean . . . as an actor's motive or intent." *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 49 (1st Cir. 2012). Furthermore, courts are permitted to use context and "common sense" to assess causation. This is especially true where the facts suggest a "campaign of actions." *Lewis v. Gov't of the Dist. of Columbia*, 161 F. Supp. 3d 15, 29 (D.D.C. 2015) (cleaned up).

Sufficient circumstantial evidence includes, the "proximity in time between the protected speech and the adverse action, the defendant's expression of opposition to the protected speech, and evidence that the defendant proffered false or pretextual explanations for the adverse action." *Media Matters for Am.*, 2025 WL 2378009 at *19 (D.D.C.) (quoting *Media Matters for Am. v.*

*Bailey*, 2024 WL 3924573 at *15 (D.D.C. Aug. 23, 2024)) (quoting *Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022)); *see also Media Matters for Am.*, 2025 WL 2988966 at *8 (D.C. Cir.).

In *Media Matters*, this Court determined that "Media Matters is likely to show that retaliatory animus was the but-for cause of the FTC's CID" because (1) "Chairman Ferguson and his colleagues have made comments characterizing Media Matters and this investigative push 'in ideological terms,'" (2) "the timing suggests the CID was motivated by retaliatory animus," and (3) "'there is evidence from which a neutral factfinder likely would find' that the Defendants' 'proffered nonretaliatory explanation for the investigation of Media Matters is pretext.'" *Media Matters for Am.*, 2025 WL 2378009 at *19–21 (D.D.C.); *see also Media Matters for Am.*, 2025 WL 2988966 at *6 (D.C. Cir.) (affirming the district court's "finding of a 'causal link' between Media Matters' protected speech and the Commission's issuance of its sweeping and unexplained Demand"). For the reasons set out in *Media Matters*, this Court should also enjoin Defendants Ferguson and the Commission from enforcing its similarly sweeping CID because it is clearly linked to GDI's protected speech as GDI was expressly targeted by Chairman Ferguson when he posted on X that "the Global Disinformation Index . . . led collusive ad boycotts"[32] before he and the Commission even issued the CID. Compl. ¶ 95.

The circumstantial evidence overwhelmingly demonstrates that the Commission's CID is linked to GDI's constitutionally protected activities for the following reasons similar to *Media Matters*: (1) the CID was issued within temporal proximity to GDI's U.S. media market report and its DEL; (2) the CID originally failed to include a subject of the investigation; (3) the CID broadly

---

[32] Andrew Ferguson (@AFergusonFTC), X (Nov. 12, 2024, 8:15 PM), https://x.com/AFergusonFTC/status/1856152760850243905.

calls for the source materials and internal research of GDI's reports and its DEL; and (4) Chairman Ferguson publicly declared his bias against GDI for its reporting activities before issuing the CID.

*First*, this Court should find similarly to *Media Matters* that GDI's CID was issued in direct retaliation to GDI's protected speech—publishing its United States media market report and releasing the DEL. *See Media Matters for Am.*, 2025 WL 2988966 at *6 (D.C. Cir.) (finding that the plaintiff's CID was "issued at a time when a pattern of litigation and information demands targeted at Media Matters had spanned virtually every day of the two years since it reported both that X had placed advertisements for technology companies next to antisemitic and hateful content and that Elon Musk had endorsed an antisemitic conspiracy theory"). Since GDI published its one media market report on the United States and began releasing its DEL, GDI has been subjected to a federal subpoena, a House Interim Staff Report, and a coordinated harassment campaign by current and former Trump Administration officials, including Chairman Ferguson. Compl. ¶ 3.

Further, the CID comes at the heels of Chairman Ferguson's post on X that "the Global Disinformation Index . . . led collusive ad boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States."[33] Compl. ¶ 95. And, a month after issuing the CID, Chairman Ferguson reiterated that the "the supreme evil of antitrust" is "collusion with other firms and the creation of pre-made 'exclusion lists' to encourage advertisers to join de facto boycotts coordinated by advertising firms and other third parties" and that "investigating and policing censorship practices that run afoul of the antitrust laws is a top priority of the Trump-Vance FTC."[34] Compl. ¶ 108.

---

[33] Andrew Ferguson (@AFergusonFTC), X (Nov. 12, 2024, 8:15 PM), https://x.com/AFergusonFTC/status/1856152760850243905.

[34] *Statement of Chairman Andrew N. Ferguson*, In the Matter of Omnicom Group / The Interpublic Group of Cos., Matter Number 2510049 (June 23, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/omnicom-ipg-ferguson-statement_0.pdf.

*Second*, like the CID in *Media Matters*, the Commission's CID to GDI initially failed to state a subject of the investigation. Compl. ¶¶ 111–12; *see Media Matters for Am.*, 2025 WL 2988966 at *7–10 (D.C. Cir.) (finding that "the district court permissibly weighed the fact that the Commission's sweeping demand was issued without the statutorily required explanation of the permissible grounds for its issuance" and "nothing in the Demand the Commission issued said what, if any, law Media Matters was being investigated for possibly violating, or what conduct of Media Matters is under investigation"). Similar to *Media Matters*, the field titled "Subject of Investigation" in GDI's CID simply stated: "See attached." Compl. ¶ 112. The attachment consisted of a generic FTC Resolution that was issued by a previous Commission in mid-2022 that authorized it to investigate anyone for "facilitating collusion or coordination in any way with any other market participant"—effectively authorizing the Commission to investigate collusive practices in ***any*** market with ***any*** participant. *Id.* The attached Resolution was not specific to advertising or the advertising industry and did not describe how GDI is related to the investigation at all. *Id.*

Additionally, the current Commission under Chairman Ferguson failed to disclose how the attached Resolution from mid-2022 is pertinent to the present investigation. *Id.* GDI's CID also requests information back to 2018—four and a half years before the claimed basis for opening an investigation. *Id.* All these issues with the original CID further underscore that the Commission under Chairman Ferguson is harassing GDI because the CID failed to provide GDI with any notice whatsoever as to what the Commission is investigating. Further, this Court should find as it did in *Media Matters* that any *ex-post facto* explanation the Commission has since created is therefore pretextual. *See Media Matters for Am.*, 2025 WL 2378009 at *21 (D.D.C.) ("The late-breaking nature of [Defendants' July 7 letter] explanation cuts in favor of finding pretext."). As further

evidence of pretext, the Commission does not have enforcement authority over nonprofit organizations like GDI. Compl. ¶ 115.

The subject of the investigation in the Commission's modified CID—which it issued almost two months later—is still vague. Compl. ¶ 113. The subject of the modified CID is purportedly to investigate "whether online advertisers and/or advertising agencies have unlawfully agreed to use certain lists promulgated by other industry participants that categorize or rate content publishers as not 'brand suitable' or not 'brand safe,' to coordinate the placement of ads." Compl. ¶ 114. GDI did not and does not purchase or sell advertising, nor has GDI ever entered into an agreement requiring advertisers or advertising agencies to place or not place ads on certain websites or publishers. Compl. ¶ 116.

*Third*, as this Court found in *Media Matters*, this Court should also enjoin the Commission's CID to GDI because it was issued in response to GDI's media reporting activities. *See Media Matters for Am.*, 2025 WL 2988966 at *7 (D.C. Cir.) (finding that "the district court did not err in considering the broad scope of the Demand—including its effort to probe into editorial decision making and journalistic actions surrounding the publication of the disfavored article—as relevant evidence of pretext"). The Commission's CID probes into GDI's underlying resources—e.g., every piece of code it has ever produced—and decision making for the publication of its market reports and DEL. *See, e.g.*, Ex. C, Modified CID at 4.

Specification 13 specifically requests GDI to produce its DEL by requiring GDI to "[p]rovide any list produced, licensed, sold, or otherwise provided by [GDI] to any third party that evaluates or categorizes any news source, news outlet, news website, or other news content publisher entities by credibility or any other categorical metric maintained by GDI." *Id.* at 3.

Specification 6 requests information relating to GDI's media market reports and its DEL—it requests "all documents relating to ratings of any media, or any other product, program, project, work, or special report relating to data, analysis, or journalism that helps companies or consumers identify reliable information or disinformation or distinguish between sources of information online." *Id.* at 2.

Specification 14 explicitly calls for "the methodology by which GDI evaluates or categorizes any news sources, news outlets, news websites, or other news content publisher entities, including but not limited to the process GDI uses to select the sample of articles on which to rate the entity or content." *Id.* at 3.

Specification 20 also calls for information related to GDI's DEL, requesting "all documents relating to the purpose of any rating, label, or categorization maintained by GDI, including but not limited to promotional and advertising materials created or disseminated by GDI." *Id.* at 4. Specification 21 requests "all documents relating to GDI's use of AI technology to provide any of its services," which directly calls for GDI's proprietary algorithm that it uses in its DEL. *Id.*

The CID is nothing more than a way to punish GDI for its constitutionally protected speech. Not one of the specifications calls for information relating to any agreements between GDI and any advertiser or advertising agency about the placement of ads or ad spend. Compl. ¶ 119. If anything, the CID is just trying to obtain more information for the harassment campaign against GDI—as shown by Specification 16 requesting "all documents reflecting allegations that GDI's reliability, credibility, safety, or other similar ratings are or may be politically biased." Ex. C, Modified CID at 3.

*Fourth*, this Court should enjoin Defendants Ferguson and the Commission from enforcing GDI's CID even more so in this case than in *Media Matters* because not only has Chairman

Ferguson proclaimed "his intent to target media groups and other actors in language that focuses on their viewpoints and the content of their speech," which the D.C. Circuit considered as evidence of pretext in *Media Matters*, but he has also made public statements expressly targeting GDI's media reporting activities before authorizing this investigation. *Media Matters for Am.*, 2025 WL 2988966 at *8 (D.C. Cir.); *cf. id.* at *11 (Walker, C.J., dissenting) ("And never mind that the record does not include a single statement about Media Matters by any decisionmaker at the FTC before the FTC's investigation.").

Chairman Ferguson has publicly expressed his hostility toward GDI's protected speech before issuing the CID. Shortly before becoming Chair of the Commission, Ferguson publicly stated that "antitrust laws may have something to say about what's been going on [with] . . . advertiser boycotts"[35] and that it is "really important that the FTC take investigative steps in the new administration under President Trump" because "progressives, Silicon Valley, [and] everyone who is fighting 'disinformation' is not going to give up just because of the election."[36] Compl. ¶¶ 96–97. He further asserted that he had "a track record of standing up to . . . the radical left" and would "[i]nvestigate . . . advertiser boycotts."[37] *Media Matters for Am.*, 2025 WL 2378009 at *19 (D.D.C.); Compl. ¶ 90.

Shortly before issuing the CID, Chairman Ferguson expressly targeted GDI in a post on X asserting that "the Global Disinformation Index . . . led collusive ad boycotts—possibly in

---

[35] Mike Benz (@MikeBenzCyber), X (Nov. 24, 2024, 6:59 PM), https://x.com/mikebenzcyber/status/1860835679560765841?s=46&t=2yQS3wsEbvI9bCYB3nT64Q.

[36] *Bannon's WarRoom, Show Clip Roundup 11/30/2024 [AM]*, WARROOM (Nov. 30, 2024), https://warroom.org/bannons-warroom-show-clip-roundup-11-30-2024-am/.

[37] *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, PUNCHBOWL NEWS, https://punchbowl.news/wp-content/uploads/FTC-Commissioner-Andrew-N-Ferguson-Overview.pdf.

violation of our antitrust laws—to censor the speech of conservative and independent media in the United States."[38] Compl. ¶ 95. A month after issuing the CID, Chairman Ferguson further declared that the "the supreme evil of antitrust" is "collusion with other firms and the creation of pre-made 'exclusion lists' to encourage advertisers to join de facto boycotts coordinated by advertising firms and other third parties" and that "investigating and policing censorship practices that run afoul of the antitrust laws is a top priority of the Trump-Vance FTC."[39] Compl. ¶ 108.

For these reasons, this Court should find as it did in Media Matters that the Commission's CID is retaliatory and clearly linked to GDI's constitutionally protected speech.

### III. The remaining equitable factors weigh strongly in favor of granting GDI's request for preliminary injunction because the Commission and Chairman Ferguson are in no way harmed from being enjoined from enforcing an unconstitutional CID.

A preliminary injunction should be granted when the balance of equities favors the plaintiff and the relief sought serves the public interest. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). In evaluating such relief, courts (1) weigh the competing claims of injury, (2) assess the impact of granting or denying the injunction on each party, and (3) give particular consideration to the public interest. *Id*. However, where a private party seeks a preliminary injunction on a government action, "balance of equities and public interest…merge." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020). The government "is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional" because "enforcement of an unconstitutional [action] is always contrary to the

---

[38] Andrew Ferguson (@AFergusonFTC), X (Nov. 12, 2024, 8:15 PM), https://x.com/AFergusonFTC/status/1856152760850243905.

[39] Statement of Chairman Andrew N. Ferguson, *In the Matter of Omnicom Group / The Interpublic Group of Cos.*, Matter Number 2510049, Fed. Trade Comm'n (June 23, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/omnicom-ipg-ferguson-statement_0.pdf.

public interest." *Id.; Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (finding that "the system is improved by [such] injunctions").

This Court should find as it did in Media Matters that "'there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional [action].'" *Media Matters for Am.*, 2025 WL 2378009 at *22 (D.D.C.) (quoting *Pursuing Am.'s Greatness*, 831 F.3d at 511); *see also Media Matters for Am.*, 2025 WL 2988966 at *11 (D.C. Cir.) (finding that the equitable factors favor Media Matters "[e]specially because whatever the Commission's prospective plans regarding this demand, it 'may not act unlawfully even in pursuit of desirable ends'") (internal citations omitted).

The Commission's CID to GDI has already chilled—and will continue to chill—GDI's constitutionally protected reporting absent this Court's injunction. The Commission cannot be harmed by being prevented from infringing on GDI's First and Fourth Amendment rights. GDI is a non-party to the Commission's investigation and cannot be subject to the Commission's jurisdiction as GDI is a nonprofit organization. Yet, the Commission has offered no explanation for why GDI would possess information related to an alleged advertiser or advertising agency boycott that could not be obtained directly from the actual targets of its investigation. Instead, the Commission has chosen to pursue a non-party outside the Commission's jurisdiction through a sweeping CID that violates GDI's constitutionally protected activities—and none of the 29 requests calls for any information that would uncover an advertiser or advertising agency boycott. It is clear that the Commission's CID is nothing more than a retaliatory act to punish GDI for reporting on matters that Chairman Ferguson and the Commission do not like.

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiff's motion for a preliminary injunction.

DATED: November 26, 2025 Respectfully Submitted,

**CLIFFORD CHANCE US LLP**

*/s/ Joseph A. Ostoyich*
Joseph A. Ostoyich (DC Bar # 436157)
William Lavery (DC Bar # 503292)**
Danielle Morello (DC Bar # 1032537)
Dorothea R. Allocca (DC Bar # 90010668)*
Kaia Pankey (DC Bar # 90020207)*
Ross Jablon (DC Bar # 90023468)*
2001 K Street NW, Ste. 900
Washington, DC 20006
(202) 912-5533
joseph.ostoyich@cliffordchance.com
william.lavery@cliffordchance.com
danielle.morello@cliffordchance.com
dodi.allocca@cliffordchance.com
kaia.pankey@cliffordchance.com
ross.jablon@cliffordchance.com

*Admission pending
**Application for pro hac vice pending

*Attorneys for Disinformation Index, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on the Defendant in accordance with

Federal Rule of Civil Procedure 5(a).

/s/ Joseph A. Ostoyich
Joseph A. Ostoyich