# **<u>EXHIBIT E</u>**

Order Denying Global Disinformation Index's Petition to Quash Civil Investigative Demand Issued by the US Federal Trade Commission

UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:  Andrew N. Ferguson, Chairman
Mark R. Meador

| | |
|---|---|
| In the Matter of<br><br>CIVIL INVESTIGATIVE DEMAND TO<br>GLOBAL DISINFORMATION INDEX<br>DATED MAY 20, 2025 | )<br>)<br>)<br>)  File No. 251-0061<br>)  PUBLIC<br>)<br>)<br>) |

## ORDER DENYING PETITION TO QUASH
## CIVIL INVESTIGATIVE DEMAND

**By FERGUSON, Chairman:**

  The Global Disinformation Index (GDI) petitions the Commission to quash in its entirety a Civil Investigative Demand (CID) issued on May 20, 2025, in connection with the Commission's investigation into whether any natural persons, partnerships, corporations, associations, or other legal entities have engaged in unfair methods of competition, including boycotts or other forms of collusion or coordination, with respect to withholding, degrading, increasing the cost of, or otherwise diminishing the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, or Section 5 of the FTC Act, 15 U.S.C. § 45.

  GDI requests that the Commission quash the CID because (1) the Commission lacks the authority under the FTC Act to enforce the antitrust laws against nonprofits like GDI; and (2) the CID infringes upon GDI's First Amendment rights.[1] *Petition*, at 6. For the reasons set forth below, we deny GDI's petition.

**I.  BACKGROUND**

  GDI describes itself as a nonprofit organization that "was guided by its charitable

---

[1] GDI sporadically argues that the CID is both unduly burdensome and vague and ambiguous, but does not expressly identify these arguments as an independent basis to quash the CID. *Petition*, at 4, 12–14. GDI does not substantiate its burden claims by affidavit or other documentation, and its failure to do so is sufficient reason to deny them. *See* 16 C.F.R. § 2.10(a)(1); *In re Civil Investigative Demand to Media Matters for Am. Dated May 20, 2025*, No. 251-0061, 2025 WL 2355463, at *10 (July 25, 2025). Likewise, "[t]he party objecting to discovery as vague or ambiguous has the burden to show such vagueness or ambiguity," *Johnson v. Kraft Foods N. Am., Inc.*, 238 F.R.D. 648, 655 (D. Kan. 2006), and GDI's passing reference to vagueness and ambiguity does not establish a basis to quash the CID.

purpose of educating the public about the risk of disinformation in online news."[2] *Petition*, at 2. GDI conducted risk assessments of news websites based on its self-selected criteria (such as ownership and editorial independence). *Id.* at 2–3. GDI's work focused on three primary areas. *Id.* at 10. First, GDI created its flagship risk assessment report, the "Dynamic Exclusion List" (DEL), a domain-level list of publishers with the highest risk of containing disinformation. *Id.*[3] GDI licensed the DEL (presumably for a fee) to "[a]d tech companies and platforms . . . [to help them] make more informed choices about their online ad purchases."[4] GDI provided the DEL to its "subscribers and clients who were free to do whatever they wanted with it via their own independent decision-making." *Id.* at 2. Second, GDI hosted an open-source intelligence hub that tracked "disinformation and extremism" across various platforms. *Id.* at 10. Third, GDI presented the findings of its disinformation research to government and regulatory bodies. *Id.*[5]

As of the date of this order, GDI "no longer provide[s] risk rating or exclusion lists," but focuses on "systemic solutions that reduce the promotion of adversarial content."[6]

On May 20, 2025, under the authority of a Commission resolution authorizing the use of compulsory process, the Commission issued a CID to GDI pursuant to Section 20 of the FTC Act, 15 U.S.C. § 57b-1. The GDI CID was one of seventeen still-outstanding CIDs issued as part of the Commission's investigation into whether entities have conspired to withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act and Section 5 of the FTC Act, under the guise of promoting "brand suitability" and "brand safety" against "misinformation." Specifically, the Commission is investigating whether online advertisers and/or advertising agencies have unlawfully agreed to use certain lists promulgated by other industry participants that categorize or rate content publishers as not "brand suitable" or not "brand safe," to coordinate the placement of ads. As such, CID recipients to date include multiple advertising agencies as well as entities that the Commission has reason to believe possess information relating to the use of such lists to coordinate ad placement. These entities include several advertising trade associations, several brand safety/suitability rating organizations, and several policy/advocacy groups such as GDI.

The CID to GDI seeks information pertaining to GDI's organizational structure; documents relating to GDI's ratings of media or similar products that help consumers distinguish between sources of information; communications with other entities related to the subject of the investigation; the methodology by which GDI evaluates or categorizes content publisher entities;

---

[2] For reasons it does not explain, GDI refers to itself in the past tense throughout its petition.
[3] *See also* GDI, *What We Do*, http://web.archive.org/web/20250824145937/https://www.disinformationindex.org/product/ (captured Aug. 24, 2025) ("The core output of the Disinformation Index is our Dynamic Exclusion List (DEL) of global news publications rated high risk for disinformation."). This description appeared on GDI's website at or around the time it filed the instant petition, but no longer appears there. *See* https://www.disinformationindex.org/product/ (last visited Nov. 17, 2025).
[4] GDI, *What We Do*, http://web.archive.org/web/20250824145937/https://www.disinformationindex.org/product/ (captured Aug. 24, 2025).
[5] *See also* GDI, *What We Do*, http://web.archive.org/web/20250824145937/https://www.disinformationindex.org/product/ (captured Aug. 24, 2025).
[6] GDI, *What We Do*, https://www.disinformationindex.org/product/ (last visited Nov. 17, 2025).

lists GDI has provided to third parties that evaluate or categorize content publisher entities; identification of GDI's customers; and GDI's financial information, among other subjects. *See generally Petition* Ex. 4 Attach., at 1–6. The relevant time period for GDI's responses is from January 1, 2018 to the present. *Id.* at 9.

The CID attached the Resolution Directing Use of Compulsory Process in Nonpublic Investigations of Collusive Practices (Omnibus Resolution) issued by the Commission on July 1, 2022. The Omnibus Resolution authorized the issuance of CIDs:

> To investigate whether any persons, partnerships, corporations, or others have engaged or are engaging in inviting, initiating, participating in, or facilitating collusion or coordination in any way with any other market participant, whether through private communications, public statements, sharing information, or other actions, in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended, or any other statutes or rules enforced by the Commission; and to determine the appropriate action or remedy, including whether injunctive and monetary relief would be in the public interest.

On July 18, 2025, the Commission sent GDI a letter modifying the May 20 CID to include an additional description of the scope and nature of the investigation. The modification letter described the subject of the investigation as:

> To determine whether any natural persons, partnerships, corporations, associations, or other legal entities have engaged in or are engaging in unfair, anticompetitive, collusive, or exclusionary acts or practices – including inviting, participating in, or facilitating boycotts or other collusion or coordination – to withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, or Section 5 of the FTC Act, 15 U.S.C. § 45, as amended, or any other statutes or rules enforced by the Commission, and to determine the appropriate action or remedy. See also the attached resolution.

*Petition* Ex. 4. The letter was signed by the Assistant Director of the Anticompetitive Practices I Division of the Bureau of Competition and was issued pursuant to Rule 2.7(*l*) of the Commission's Rules of Practice, 16 C.F.R. §2.7(*l*). The letter attached a modified copy of the CID that included the above subject of the investigation, but was identical to the May 20 CID in all other respects.

GDI appears to have had four substantive meet-and-confer sessions with Commission staff, on June 6, July 14, September 12, and September 15, 2025. *See Petition* Ex. 1, at 1–6 (Statement of Counsel Pursuant to 16 C.F.R. § 2.10(a)(2)).[7] During those meet-and-confers, GDI raised objections to the CID based on the Commission's statutory authority and the First Amendment, but does not appear to have offered any proposals to modify the CID's specifications in a manner that would address its concerns while providing the Commission the

---

[7] GDI claims that it conferred with staff on sixteen separate occasions "to discuss the scope, burden, and unconstitutionality of the CID," *Petition*, at 5, but based on its Statement of Counsel, many of these appear to be scheduling emails or other non-substantive communications.

3

information it needs. *See id.*

The return date of the modified CID was August 20, 2025. Commission staff granted two extensions to the return date, to September 3, 2025 and then September 17, 2025. *Petition* Ex. 1, at 4–5. GDI timely filed the instant petition on September 17, 2025.[8]

## II.   ANALYSIS

### A.   The Commission Has Authority to Serve a CID on Any Legal Entity.

GDI first argues that, because it is a nonprofit, the FTC lacks authority to enforce the antitrust laws against it under Sections 4 and 5 of the FTC Act, 15 U.S.C. §§ 44–45. *Petition*, at 7–8. Section 5 provides, in relevant part, that the FTC has authority to prevent "persons, partnerships, or corporations" from using unfair methods of competition in or affecting commerce. 15 U.S.C. § 45(a)(2). Under Section 4, a "corporation" includes any company, "incorporated or unincorporated, which is organized to carry on business for its own profit or that of its members." *Id.* § 44. GDI attaches documents purporting to show its nonprofit status and argues that "the Commission's lack of jurisdiction to enforce antitrust laws against GDI necessarily limits its ability to issue a CID for which [GDI] is a target." *Petition*, at 8 & Ex. 3.

The question of whether the Commission has enforcement authority over GDI is irrelevant because this argument confuses the Commission's enforcement authority with its broader investigatory authority.[9] The plain language of the FTC Act makes clear that the Commission has the authority to issue this CID as part of its investigation. Section 20 authorizes the Commission to serve a CID on any "person." 15 U.S.C. § 57b-1(c)(1).[10] "Person" for purposes of Section 20 is defined as "any natural person, partnership, corporation, association, or *other legal entity*, including any person acting under color or authority of State law." *Id.* § 57b-1(a)(6) (emphasis added). Prior Commission decisions have recognized that Section 20 authorizes the Commission to obtain information from any "legal entity," irrespective of whether the entity falls within the definition of "corporation" in Section 4 of the FTC Act. *See In re Civil Investigative Demand to Media Matters for Am. Dated May 20, 2025*, No. 251-0061, 2025 WL 2355463, at *8 (July 25, 2025); *In re Aug. 11, 2022 Civil Investigative Demand Issued to Childhood Leukemia Found., Inc.*, No. 222-3073, 2023 WL 8112947, at *2 (Nov. 17, 2023) ("[T]he plain language of Section 20 permits the Commission to serve a CID on any legal entity, regardless of whether it is a 'corporation' within the meaning of Section 4[.]"); *In re Mar. 19,*

---

[8] Commission staff granted several extensions to the deadline for GDI to file a petition to limit or quash the CID, the latest of which was September 17, 2025. Under Commission Rule 2.10(c), 16 C.F.R. § 2.10(c), the Commission had 40 days, or until October 27, 2025, to issue an order ruling on GDI's petition. Due to the lapse in federal government appropriations from October 1 through November 12, 2025, this date has been extended until December 10, 2025.
[9] The Commission does not concede that it lacks enforcement authority over GDI.
[10] Section 20(c)(1) provides: "Whenever the Commission has reason to believe that any person may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title), or to antitrust violations, the Commission may, before the institution of any proceedings under this subchapter, issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to produce such documentary material for inspection and copying or reproduction, to submit such tangible things, to file written reports or answers to questions, to give oral testimony concerning documentary material or other information, or to furnish any combination of such material, answers, or testimony." 15 U.S.C. § 57b-1(c)(1).

4

*2014 Civil Investigative Demand Issued to Police Protective Fund, Inc.*, No. 132-3239, 2014 FTC LEXIS 130, at *5 (May 22, 2014) (petitioner's objections "confuse the Commission's investigatory authority (under Section 20 of the FTC Act) with its enforcement authority (under Section 5)"); *In re Feature Films for Families, Inc.*, No. 102-3023, 2010 FTC LEXIS 134, at *8 (Sept. 23, 2010) (Commission "can require production of material from an entity that is not subject to the Commission's enforcement authority if that material furthers the investigation of possibly illegal conduct by entities that are subject to the agency's jurisdiction, such as for-profit telefunders making calls on [the CID recipient's] behalf"). GDI does not dispute that it is a "legal entity" that is subject to Section 20's definition of "person." Therefore, regardless of whether the Commission may enforce the antitrust laws against GDI, it is subject to the Commission's investigatory jurisdiction and may properly be issued a CID.

### B. Complying With the CID Would Not Violate GDI's First Amendment Rights.

GDI argues that forcing it to comply with the CID would violate its First Amendment rights. *Petition*, at 6–7. More specifically, it contends that compliance with all but Specifications 1–3 of the CID (which it has already produced) would "compel disclosure of its sources, methods, and internal research—core elements protected by the First Amendment—that GDI used in its DEL, open-source intelligence hub, and research reports." *Petition*, at 10–11. We are unpersuaded for two reasons: the public interest in effective law enforcement outweighs GDI's qualified First Amendment privilege in withholding information (assuming such a privilege exists), and GDI has not met its burden of showing that the information sought by the CID falls within that privilege.[11]

Some courts have held that the First Amendment "provides journalists with a qualified privilege against compelled disclosure of information obtained through their news gathering activities." *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 118 (D.D.C. 2002); *see also Zerilli v. Smith*, 656 F.2d 705, 712–14 (D.C. Cir. 1981). In those courts that have recognized the privilege, the reporter invoking the privilege bears the burden of demonstrating its applicability. *See Hutira*, 211 F. Supp. 2d at 119 nn.4–5. "[T]he critical question for deciding whether a person may invoke the journalist's privilege is whether she is gathering news for dissemination to the public." *Shoen v. Shoen*, 5 F.3d 1289, 1293 (9th Cir. 1993). In other words, assuming the

---

[11] GDI claims that "[s]imilar specifications in the Media Matters CID . . . have already been found to unconstitutionally seek a reporter's resource materials," referring to the preliminary injunction entered by the U.S. District Court for the District of Columbia against enforcement of a CID issued to Media Matters for America in this investigation. *Petition*, at 6 (citing *Media Matters for Am. v. FTC*, ___ F. Supp. 3d ____, 2025 WL 2378009, at *1–4 (D.D.C. Aug. 15, 2025)). The Commission respectfully disagrees with the district court's order and is appealing the preliminary injunction. Moreover, GDI's claim misunderstands the district court's decision. The court expressly based the preliminary injunction on its finding "that Media Matters is likely to succeed on its First Amendment retaliation claim, which is all it needs at this stage." *Media Matters*, 2025 WL 2378009, at *2. In other words, the court addressed whether the CID's issuance constituted a retaliatory action, not whether individual CID specifications violated a First Amendment privilege. Here, GDI does not advance a retaliation theory of harm, aside from a passing and unsupported assertion that the purpose of the Commission's investigation is "to punish GDI's exercise of free speech." *Petition*, at 12. The district court's preliminary injunction order is therefore inapplicable to GDI's petition.

existence of the privilege,[12] the person seeking to invoke the privilege "must demonstrate, through competent evidence, the intent to use material—sought, gathered or received—to disseminate information to the public and that such intent existed at the inception of the newsgathering process." *von Bulow v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987).

### 1.     The Public Interest

The Supreme Court has held that only in limited circumstances will the First Amendment bar the government from gathering information during a law enforcement investigation. In *Branzburg v. Hayes*, 408 U.S. 665 (1972), the Court considered whether the First Amendment protected journalists from revealing confidential information and sources in response to a grand jury subpoena. The Court ruled in favor of the government, noting that it could "perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial." *Id.* at 690–91; *see also Zerilli*, 656 F.2d at 711 ("The Court justified this decision by pointing to the traditional importance of grand juries and the strong public interest in effective criminal investigation.").

The Commission exercises investigative law enforcement powers akin to those of a criminal grand jury. Indeed, the Supreme Court has noted that the Commission "has a power of inquisition . . . . [that] is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated." *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950); *see also In re Grand Jury Proceedings*, 486 F.2d 85, 90 (3d Cir. 1973) ("Grand jury subpoenas then, when they are brought before the federal courts for enforcement, for all practical purposes are exactly analogous to subpoenas issued by a federal administrative agency on the authority of a statute, without any prior judicial control."). As such, when the Commission acts in its law enforcement capacity, as it does here, the public interest in the ability to thoroughly gather evidence outweighs any qualified First Amendment privilege.

### 2.     GDI's Burden

GDI also fails to meet its burden to show that the material sought by the CID qualifies for the journalist's privilege as recognized by some courts. First, GDI broadly claims that complying with the CID would force it to disclose "sources, methods, and internal research" that it uses to create the DEL and conduct other journalistic activities. *Petition*, at 10. But these general, unsupported statements do not provide "competent evidence" demonstrating where GDI obtained the information in question and whether the organization intended to disseminate the information to the public at the time it received it. *von Bulow*, 811 F.2d at 144. Such "blanket assertions" of

---

[12] *See In re Request from U.K. Pursuant to Treaty Between Gov't of U.S. and Gov't of U.K. on Mutual Assistance in Criminal Matters in the Matter of Dolours Price*, 685 F.3d 1, 17 n.23 (1st Cir. 2012) ("[T]here is a circuit split on whether under *Branzburg* [*v. Hayes*, 408 U.S. 665 (1972)] there can ever be a reporter's privilege of constitutional or common law dimensions."); *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1145–49 (D.C. Cir. 2006) (rejecting existence of constitutional reporter's privilege in grand jury proceedings); *cf. Chen v. FBI*, 153 F.4th 1289, 1295 (D.C. Cir. 2025) (declining to recognize a federal common law newsgathering privilege).

privilege, *id.* at 147, are insufficient under both *von Bulow* and the Commission's Rules of Practice. To properly assert a "claim of protected status" in response to the CID, GDI needed to "include a detailed log of the items withheld . . . of sufficient detail to enable the Commission staff to assess the validity of the claim for each document . . . . The failure to provide information sufficient to support a claim of protected status may result in a denial of the claim." 16 C.F.R. § 2.11(a)(1). GDI submitted no such privilege log here, and its privilege claim can be denied on that basis alone.

Second, at least as to the DEL, GDI's argument conflates its commercial and journalistic activities. To the extent a First Amendment newsgathering privilege exists, it applies only where there is an intent to disseminate information to the *public*, which is at the heart of the "paramount public interest in . . . an[] independent press capable of participating in robust, unfettered debate." *von Bulow*, 811 F.2d at 144 (cleaned up). By contrast, GDI appears to have licensed the DEL only to "clients and subscribers" (not the public), for a fee, via terms spelled out in private licensing agreements. *See supra* Part I; *Petition*, at 2–3. Those clients and subscribers were under no obligation to disseminate the materials they received from GDI to the general public or otherwise put them to public use. Indeed, GDI's petition acknowledges that for the DEL, its subscribers and clients "were free to do whatever they wanted with it via their own independent decision-making." *Petition*, at 2–3 ("[E]ach of GDI's subscribers was free to use" the DEL "to inform its independent brand safety decisions or to disregard on a case-by-case basis, as it saw fit."). These circumstances describe garden-variety commercial arrangements, not journalism. Licensing a commercial product for a fee to select commercial purchasers via private contract is not "disseminat[ing] information to the public," *von Bulow*, 811 F.2d at 147, which is required for First Amendment protection. *See also Am. Sav. Bank, FSB v. USB PaineWebber, Inc.*, No. M8-85, 2002 WL 31833223, at *2–3 (S.D.N.Y. Dec. 16, 2002) (denying motion to quash subpoena to credit rating agency that performed fee-based ratings subject to private contractual agreements, since circulating information only to private counterparties was not newsgathering and did not qualify for First Amendment privilege).

Third, without further explanation from GDI, it is not clear that many of the CID's specifications demand the production of reporters' confidential resources, sources, methods, or notes. For example, Specification 13 requests "any list produced, licensed, sold, or otherwise provided by You to any third party that evaluates or categorizes any news, media, sources, outlets, platforms, websites, or other content publisher entities by credibility or any other categorical metric maintained by GDI." *Petition* Ex. 4 Attach., at 3. GDI fails to explain how lists provided to a third party, such as the DEL, or the sources used to assemble them are privileged. Likewise, Specification 17 requests documents "reflecting allegations that GDI's reliability, credibility, safety, or other similar ratings (or the criteria upon which they may be based) are or may be unreliable, subjective, unscientific, or otherwise methodologically unsound." *Id.* We think it unlikely that GDI considers allegations about the unreliability of its products to be a subject for dissemination to the public as news, and GDI does not indicate otherwise. Without further detail, which GDI could have provided through the meet-and-confer process and its affidavit, we are left to guess at how the CID's specifications might violate any First Amendment journalist's privilege that GDI may hold.

Accordingly, assuming the First Amendment journalist's privilege exists, we reject its application to this CID.

7

### III. CONCLUSION

For the foregoing reasons, GDI's petition to quash is denied.

**IT IS HEREBY ORDERED THAT** GDI's Petition to Quash the May 20, 2025, Civil Investigative Demand be, and hereby is, **DENIED.**

**IT IS FURTHER ORDERED THAT** GDI shall comply in full with the Commission's Civil Investigative Demand no later than **January 13, 2026**, or at such other date, time, and location as the Commission staff may determine.

By the Commission, Commissioner Meador recused.

April J. Tabor
Secretary

SEAL:

ISSUED: December 10, 2025